**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOHN DOE,**

            **Plaintiff,**

     **v.**                          **No. 5:19-cv-1467**
                                       **(TJM/ATB)**

**SYRACUSE UNIVERSITY, KENT**
**SYVERUD, individually and as agent**
**for Syracuse University, PAMELA PETER,**
**individually and as agent for Syracuse**
**University, SHEILA JOHNSON-WILLIS,**
**Individually and as agent for Syracuse**
**University, and BERNERD JACOBSON,**
**individually and as agent for Syracuse**
**University,**

            **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

### DECISION & ORDER

     Before the Court is Defendants' motion to dismiss the Complaint.  See dkt. # 26.

The parties have briefed the issues, and the Court has determined to decide the matter

without oral argument.

**I.**     **Background**

     This case involves Defendant Syracuse University's investigation of allegations of

sexual misconduct leveled at the Plaintiff.  Plaintiff, identified by the pseudonym "John Doe,"

is a former student at Defendant Syracuse University ("Syracuse" or "the University").  See

1

Complaint ("Complt."), dkt. # 1, at ¶ 13.  Syracuse was Doe's "dream school."  Id. at ¶ 26.

He studied civil engineering and was enrolled in an accelerated Master in Business

Administration ("MBA") program.  Id.  The MBA program was "extremely selective."  Id.  At

the time in question, Plaintiff had a 3.1 grade average and was on track to receive a

bachelor's degree in 2018 and his MBA in 2019.  Id.  At the time of the events giving rise to

this action, Plaintiff was seven credits short of graduation.  Id. at ¶ 28.

Plaintiff was a member of the Delta Kappa Epsilon ("DKE") fraternity at Syracuse.  Id.

at ¶ 27.  He lived in the DKE fraternity house at Syracuse from Fall 2015 to Fall 2017.  Id.

Doe was elected president of DKE's Syracuse chapter in Spring 2016.  Id.  Prior to April

2017, Plaintiff had never had any disciplinary problems at Syracuse.  Id. at ¶ 29.  He had no

criminal history and had never been arrested.  Id.

On April 22, 2017, DKE and a sorority, Kappa Kappa Gamma ("KKG"), hosted a joint

party.  Id. at ¶ 30.  The party was scheduled to begin at 11:00 p.m.  Id.  Jane Roe, a

member of KKG arrived with other women from the sorority a few hours before the official

start of the party to "pregame"  Id.  Plaintiff joined these women for that event in a second-

floor room at the fraternity house.  Id.  He and Jane Roe both drank alcohol.  Id.  They also

talked together.  Id.  The two had been friends before that night, but had never dated and

had not had any "sexual interaction."  Id.

After about two hours of this "pregame" activity, Plaintiff and Roe went downstairs to

the party, where alcohol was also available.  Id. at ¶ 31.  Witnesses saw Roe and the

Plaintiff kissing on the dance floor during the party.  Id.  DKE surveillance video shows that

Jane Roe followed plaintiff to his room at around 12:21 a.m. on April 23, 2017.  Id.  Plaintiff

alleges that the video demonstrates that Roe walked behind the plaintiff and entered his

room voluntarily.  Id.  Plaintiff and Roe both woke up later that morning, fully clothed and unable to remember "what had occurred after midnight."  Id. at ¶ 32.  Plaintiff alleges that surveillance video shows Roe leaving Plaintiff's room around 10:30 a.m. "in no apparent distress."  Id.

The next day, April 24 2017, Roe went to Crouse Hospital in Syracuse for a Sexual Assault Nurse Examination ("SANE").  Id. at ¶ 33.  She also asked for "a battery of tests" that included a urine sample and a DNA test.  Id.  The SANE test did not show any sign of sexual contact or bodily fluids.  Id.  Neither did that test show any injuries to Roe's anus.  Id.

Roe went to the Syracuse Police Department on April 27, 2017, complaining that "she may have been sexually assaulted."  Id. at ¶ 34.  Syracuse Police Detective Michael Bates and Assistant District Maureen Barry received the assignment to investigate.  Id.  Detective Bates interviewed Roe for the first time on May 1, 2017.  Id.  At that time, Roe stated that she had "'blacked out'" "'halfway through the night'" and could not remember anything after 12:30 a.m. on April 23, 2017.  Id.  Bates interviewed Roe again on May 4, 2017.  Id. at ¶ 35.  She could not remember any additional details.  Id.  Another interview on May 10 yielded the same results.  Id.  Detective Bates showed Roe surveillance tape from the hallway of the fraternity house.  Id.  She stated that she did not recall entering the room and could not remember anything that happened after midnight on the night in question.  Id.

Bates received the forensic toxicology report from the Crouse Hospital examination of Roe's urine sample on April 24, 2017.  Id. at ¶ 36.  The report showed that the only items in Roe's bloodstream were caffeine and marijuana.  Id.  The analysis did not show any other drugs or intoxicants.  Id.

Plaintiff voluntarily spoke with Bates without the benefit of counsel.  Id. at ¶ 37.

3

Plaintiff alleges that he was "completely forthcoming" and "answered all questions posed to him." Id.  Plaintiff contends that Bates had a chance "to make his own credibility determination of" the Plaintiff.  Id.  After this meeting, Bates arranged a "controlled call" between him and Jane Roe.  Id. at ¶ 38.  Bates intended to use the call "to surreptitiously gather evidence against" Plaintiff.  Id.  He hoped that Plaintiff would provide inculpatory evidence in the form of "statements or confessions" to Roe.  Id.  Plaintiff alleges that the "call proved fruitless," since he "had nothing to confess and–as he has always maintained–he has no recollection of that night."  Id.

The Syracuse Police Department closed the case.  Id. at ¶ 39.  The Department acted because lab results did not show any incapacitating drugs in Roe's system, Roe could not remember the events of the night in question, the controlled call did not contradict Plaintiff's story, and the SANE produced no physical evidence of assault.  Id.  Bates forwarded his report to Barry.  Id.  After evaluating Barry's investigation, the District Attorney's own investigation, and interviewing Jane Roe, Barry likewise decided not to pursue any charges against Plaintiff.  Id. at ¶ 40.  Barry's report concluded that no corroborating evidence existed to support an allegation of sexual assault.  Id.  Indeed, she found no evidence that any sexual activity had even occurred.  Id.  Barry also found that no evidence existed to show that Roe had not consented to any sexual activity that may have occurred.  Id.  Neither the Syracuse Police Department nor the Onondaga County District Attorney brought any charges against the Plaintiff.  Id. at ¶ 41.

Jane Roe filed a formal complaint with Syracuse University on June 2, 2017.  Id. at ¶ 86.  She alleged that Plaintiff had sexually assaulted her on April 22-23, 2017.  Id.  Following University policy, Syracuse assigned a Title IX investigator to examine the case.

4

Id. at ¶ 87.  Defendant Bernerd Jacobson was that investigator.  Id. at ¶ 88.  Jacobson has

a background as a "Special Victims' Counsel."  Id.  That role consists of "assisting, advising,

and protecting the rights of victims of sexual assault."  Id.  Plaintiff alleges that such a

biography does not indicate that Jacobson was a "neutral and unbiased investigator."  Id.

Plaintiff received formal notification from the University on July 10, 2017 that he was

alleged to have violated three sections of the University's Student Code of Conduct.  Id. at

¶ 89.  The complaint alleged that he violated:

> (i) Code 1) Physical harm or threat of physical harm to any person or persons,
> including, but not limited to: assault, sexual abuse, or other forms of physical abuse;
> (ii) Code 3) Conduct–whether physical, verbal or electronic, oral, written or
> video–which threatens the mental health, physical health, or safety of any person or
> persons including, but not limited to, hazing, drug or alcohol abuse, bullying, or other
> destructive forms of behavior; and (iii) Code 15) Violation of University policies, rules,
> or regulations that are published in the Student Handbook or other official University
> publications or agreements. [Referring to:] Syracuse University Policy on Sexual
> Assault, Sexual Harassment, Stalking or Relationship Violence and/or Information
> Technology Resources Acceptable Use Polic[y].

Id.  The notification informed Plaintiff that the University "was conducting its own Title IX

investigation pursuant to" the University's Code of Conduct.  Id. at ¶ 90.

Plaintiff alleges that the investigation was biased against him from the start.  Id. at ¶

91.  He contends that Jacobson–who had a background in "assisting, advising, and

protecting" victims–began his investigation with a series of "preconceptions" about Plaintiff's

responsibility for the matter.  Id. at ¶ 92.  Jacobson, Plaintiff claims, "presumed" Plaintiff to

be liable, and was preconditioned to believe Roe's claims about Plaintiff.  Id.  Jacobson

allegedly held these biases despite the "multiple contradictory and inconsistent statements"

Jane Roe made throughout the investigation.  Id.  "In short," Plaintiff claims, "Jacobson

acted not as a neutral investigator, but an advocate developing a case for the 'victim.'"  Id.

Jane Roe initially told Jacobson that she could not remember entering Plaintiff's room on the night in question.  Id. at ¶ 93.  She stated that she could not remember anything that happened from when she entered the room until she awoke several hours later.  Id.  She had repeated that story four times to Detective Bates.  Id.  Weeks later, however, Roe claimed to Jacobson that she had started to have "sudden flashes of memories following a visit to a therapist."  Id. at ¶ 94.  She could now "describe fragmented memories of having sexual interourse with" Plaintiff.  Id.  She also remembered that Plaintiff "sodomized" her without consent.  Id.  Even though he had no supporting medical or physical evidence, Jacobson "credited" Roe's "contrived recollection," Plaintiff claims.  Id. at ¶ 95.  He somehow treated Roe's testimony as "consistent and reliable," despite "glaring inconsistencies."  Id.  Plaintiff alleges that Jacobson never spoke with Detective Bates, DA Barry, or the SANE nurse who examined Jane Roe.  Id.  He never asked the Detective if he found Plaintiff credible.  Id.

Plaintiff alleges that Jacobson was "predisposed to believe any 'victim'" when he met with Plaintiff, despite the fact that Plaintiff had never strayed from his initial account of the events in his room on the night in question.  Id. at ¶ 96.  Plaintiff continued to state that he had no memory of what happened, and no memory of any sexual encounter with Jane Roe.  Id.  Jacobson evaluated the credibility of Plaintiff and Jane Roe.  Id. at ¶ 97.  He found "some concern about the reliability of the information [Plaintiff] provided[.]" Id. at ¶ 98.  Plaintiff, Jacobson concluded, "simply lacks memory for most of the time in his room" on the night in question.  Id.  "[O]verall," Jacobson found, "he appears credible but provided limited information about the course of events."  Id.

In evaluating Jane Roes credibility, by contrast, Jacobson concluded "[s]he has been

transparent and spoken with great candor about what occurred and what she believes occurred, being careful to distinguish what she knows from what she believes." Id. at ¶ 99. While Roe could not remember "details of what happened," Plaintiff alleges, and had "expressed some uncertainty and confusion," Jacobson noted "no attempt to fabricate or fill in details" in her statement. Id. While Roe was "uncertain" about "aspects of the night for which she lacks definite memory specifically, the memory fragment where she assumes that sex was happening because of the way her head was repeatedly hitting the wall but does not recall anything from the waist down," Jacobson still found Roe "credible and the information she provides reliable, though limited by her lack of memory." Id. Plaintiff alleges that Jacobson found his testimony unreliable because of his intoxication and inability to remember details while simultaneously crediting Jane Roe's statements despite the fact that she admitted a similar difficulty in remembering the evening's events. Id. at ¶ 100. Jacobson used terms like "augmented," "external influences," and "not implausible" to describe Roe's memories of the incident. Id. at ¶ 101. He did not "need" to use such to explain Plaintiff's version coherently, but he still found Roe more credible than Plaintiff. Id.

Plaintiff points to other evidence that he claims also demonstrates Jacobson's "extreme bias" and the way he "predetermined" the outcome. Id. at ¶ 102. Jacobson, he claims, acknowledged that Roe had filed a family court complaint that "contradict[ed] any version of the events she provided" Jacobson. Id. at ¶ 102(a). Still, even as he admitted that she had provided an "exaggerated" version of what happened, Jacobson excused the filing by blaming it on the "overzealous" representation provided by Roe's representative. Id. Jacobson also reconized that Roe's memory of the evening when she initially discussed the events with him had been "augmented by information learned from speaking with other

witnesses," mostly "her friends and roommates[.]"  Id. at ¶ 102(b).  These friends, Plaintiff claims, had no knowledge of what happened in his room, but instead "engage[d] in wild speculation and conclusory statements such as 'we know what happened[.]"  Id.  Jacobson noted that Roe's claims that she had been drugged were "not implausible," even though toxicology reports showed otherwise.  Id. at ¶ 102(c).  Plaintiff claims that Roe's statements to Jacobson about testing contradicted the actual test reports, and his report ignored that discrepancy and failed to address Roe's "lies" about the testing results.  Id. at ¶ 102(d).  On May 8, 2017, Roe provided photographs that purported to show injuries to her anus.  Id. at ¶ 102(e).  Jacobson credited these photographs, even though the SANE examination revealed no such injuries.  Id.  Jacobson's report also repeatedly alleged that Roe's underwear was "soaked" with blood in the vaginal area, even though no evidence ever described the underwear this way.  Id. at ¶ 102(f).  Though the SANE nurse had collected Roe's clothing, Jacobson did nothing to examine the clothes or speak to the nurse.  Id.  Assistant District Attorney Barry stated in her letter dismissing the prosecution that there was no obvious blood stain on the underwear.  Id.  Jacobson also did not find damage to Roe's credibility in her claim that an object had been used to violate her sexually, even though no evidence existed to support such a claim.  Id. at ¶ 102(g).  Plaintiff also claims that Jacobson was not impartial in questioning him, asking him why Roe would lie and dismissing inconsistencies between her account and police reports.  Id. at ¶¶ 102(h)-(I).  Finally, Plaintiff alleges that Jacobson did not do any independent investigation beyond interviewing witnesses.  Id. at ¶ 103.  He did not speak to anyone at the Syracuse Police or Onondaga County District Attorney's Office and failed to contrast Roe's statements to him with those she made to other investigators.  Id.

8

Plaintiff alleges that Jacobson's report was not only biased and aimed at reaching a predetermined outcome, but was also "untimely," coming on October 5, 2017, more than five months after Roe filed her complaint.  Id. at ¶¶ 104-105.

Plaintiff's then-attorney, Scott Brenneck, sent Jacobson a letter in response to the report on October 16, 2017.  Id. at ¶ 106.  Brenneck requested that his letter be included in Doe's response to the report.  Id.  Jacobson knew that Brenneck was drafting a letter and never objected to that action.  Id.  Indeed, Jacobson requested that Brenneck provide any DNA or toxicology reports he obtained, since Jacobson had not obtained them before he wrote his report.  Id.  Defendant Sheila Johnson-Willis informed Plaintiff on October 17, 2017 that Syracuse did not accept responses to reports from attorneys.  Id. at ¶ 107.  Plaintiff's lawyer responded to Johnson-Willis on October 18, 2017.  Id.  He stated that Jacobson had never objected to his response, and asked Johnson-Willis why she had a problem.  Id.  Johnson-Williis told Plaintiff and his lawyer that same day that Syracuse would not accept Plaintiff's response, but would incorporate the DNA and toxicology reports into the document.  Id.  Johnson-Willis did not understand that the DNA report was not yet available.  Id.

Plaintiff filed a complaint with Syracuse alleging bias on Jacobson's part on October 27, 2017.  Id. at ¶ 108.  Some person or entity later dismissed the complaint.[1]  Id.

Syracuse's policies provide that, upon completion of an investigation, the investigator provides the written investigation report, written responses of the complainant and the respondent, and a statement of alleged violations of the Code of Conduct to a three-

_____

[1]Plaintiff's use of the passive voice makes it impossible for the Court to ascertain what person or entity dismissed the report.

member University Conduct Board ("UCB") panel.  Id. at ¶ 109.  Such panels consist of "trained faculty and staff members."  Id.  The policy gives the UCB panel "sole discretion" to decide whether to rely on the investigator's report or to conduct its own interviews and gather additional information.  Id. at ¶ 110.  The panel can also interview the investigator. Id.  In this case, the panel did not interview any additional witnesses.  Id.  The UCB panel also did not interview Jacobson.  Id.  University policy also provides that the complainant and the respondent will be invited to speak at a hearing before the UCB panel.  Id.  at ¶ 111.  There, they may present any additional relevant information they have on the case. Id.  The UCB employs a "preponderance of the evidence" standard in determining whether a violation occurred.  Id. at ¶ 112.

A three-member panel held a hearing on November 7, 2017.  Id. at ¶ 113.  Jane Roe alleged that Plaintiff had raped her, sodomized her, and touched her genitals without her consent.  Id. at ¶ 114.  She claimed that she had suffered physical injuries to her vagina and anus, and that she had experienced general pain and discomfort that lasted for days after the incident.  Id.

The hearing rules permitted Plaintiff to have his lawyer present as a "supporter" or an "advisor" during the hearing.  Id. at ¶ 115.  The rules did not permit Plaintiff's attorney to speak during the hearing.  Id.  The rules also did not permit Plaintiff's attorney to cross-examine Roe about her allegations.  Id.  Plaintiff could not confront the alleged "inconsistencies" in Roe's statements.  Id.  He also could not confront her with "numerous prior statements that she did not recall what happened" on the night in question.  Id.

The UCB panel issued a decision on November 15, 2017.  Id. at ¶ 116.  Defendant Pamela Peter issued the opinion, which found Plaintiff "responsible" for three Code

violations.  Id.  The UCB panel's decision included findings of fact.  Id. at ¶ 117.  The panel

found that neither Jane Roe nor Plaintiff could remember walking to Plaintiff's room, nor

could they remember any of the events that occurred after they entered the room.  Id.  Their

first memories were waking up the next morning.  Id.  Despite the fact that Roe could not

remember any of the events in the room, the panel still found that Roe's injuries were the

result of unwanted sexual contact with the Plaintiff.  Id. at ¶ 118.  The panel found that,

even though the cause of Roe's injuries was unknown, they were more likely than not

inflicted by Plaintiff.  Id. at ¶ 119.  According to the panel, Roe's injuries were more likely

than not caused by Plaintiff inserting an unknown object into Roe's vagina.  Id. at ¶ 120.

Even though Roe had no recall of the events in the room, the UCB panel still credited her

claims.  Id. at ¶ 121.  The UCB panel also found that the results of the SANE examination

supported Roe's claims, even though the SANE examination found no evidence of sexual

assault.  Id. at ¶ 122.  The panel did not have the SANE report, and relied on two pages of

Jacobson's notes.  Id.  The panel's findings about the SANE examination, which Plaintiff

claims are "incredulous," allegedly "contradict" directly the findings of police investigators

and the District Attorney.  Id. at ¶ 123.  The panel also found Roe's description of her

experience consistent with that of a trauma survivor, even though no expert on that issue

testified before the panel.  Id. at ¶ 124.  The UCB panel rejected a letter from ADA Barry,

noting the different standards in criminal cases.  Id. at ¶ 125.

    The University expelled Plaintiff on the day the UCB panel issued its report,

November 15, 2017.  Id. at ¶ 129.  Plaintiff filed a timely appeal.  Id. at ¶ 130.  The

University Appeals Board conducted a hearing on November 29, 2017.  Id. at ¶ 131.

Rebecca Reed Katrowitz, Interim Senior Associate Vice President and Dean, informed

Plaintiff by letter on December 5, 2017 that the University Appeals Board had denied his appeal and upheld the UCB decision.  Id. at ¶ 132.  The Appeals Board upheld Plaintiff's expulsion.  Id. at ¶ 133.

Plaintiff filed his Complaint on November 25, 2019.  The Complaint raises three causes of action.  Count One, raised against all Defendants, alleges a violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681.  Plaintiff alleges that the University's disciplinary proceedings assumed that men were aggressors and women victims in sexual misconduct investigations.  Count Two alleges a breach of contract by the University for failing to follow the procedures outlined in Syracuse's policies.  Count Three alleges promissory estoppel against Syracuse.

After Plaintiff served Defendants with the Complaint, they filed the instant motion to dismiss.  The parties then briefed the issues, bringing the case to its present posture.

## II.    LEGAL STANDARD

Defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Defendants argue that Plaintiff has not stated a claim upon which relief could be granted, even if all factual allegations in the complaint were proved true.  In addressing such motions, the Court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."  Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009).  This tenet does not apply to legal conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544,

12

570 (2007)).

### III.   Analysis

Defendants move to dismiss each claim asserted in the Complaint.  The Court will address each in turn.

At the outset of its brief, Syracuse argues that the environment Plaintiff alleges which pressures universities to bring sexual misconduct cases against men has changed.  During an earlier period, Syracuse argued, universities faced pressure from the federal government to investigate cases and bring charges, often at the expense of the rights of the accused.  Courts and plaintiffs alleging Title IX violations had often cited a 2011 "Dear Colleague" letter from the United States Department of Education to universities as the source of much of these efforts to ramp up enforcement.  Syracuse points out that the Department of Education has withdrawn that letter and "shifted" pressure towards "greater protections for accused students."  Given those changes, Syracuse argues, the case law that relied on this alleged pressure to support allegations and convict accuser no longer applies.

The Court notes that the instant motion is a motion to dismiss, and that the Court is to accept all well-pleaded allegations as true, and make all inferences in favor of the non-moving party.  Whatever Defendants' assessment of the current atmosphere surrounding allegations of sexual misconduct on college and university campuses, a debate about the changing climate on university campuses is not appropriate at this stage of the proceedings.  Moreover, the Defendants do not contend that the Second Circuit has rejected the legal principles articulated in cases like Doe v. Columbia Univ., 831 F.3d 46 (2d Cir. 2016).  The Court of Appeals has articulated the law that shall be applied to the facts in this case.  At

this stage of the proceedings, the Court will apply the law to the facts as alleged by the Defendants.  To the extend that the case proceeds to discovery, the parties can develop facts concerning the climate towards allegations of sexual misconduct as it existed on the Syracuse campus at the relevant times.

### i.  Title IX

Plaintiff's first a cause of action alleges gender-based discrimination in violation of Title IX of the Education Amendments Act of 1972.  Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX, "which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities." Columbia Univ., 831 F.3d at 53.  "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[ ] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'"  Id. (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)).

Cases attacking university disciplinary proceedings on the ground of gender bias "fall generally within two categories."  Yusuf, 35 F.3d at 715.  In the first category, "erroneous outcome" cases, "the claim is that the plaintiff was innocent and wrongly found to have committed an offense."  Id.  In the second, "selective enforcement" cases, the "claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."  Id.  Under either

14

theory, Plaintiff must plead and prove that "the complained-of conduct was discriminatory." Yusuf, 35 F.3d at 715. Thus, in order to establish a claim of discrimination under Title IX, Plaintiff must ultimately show that the defendant discriminated against him because of sex, that the discrimination was intentional, and that the discrimination was a "substantial" or "motivating factor" for the defendant's actions. Prasad v. Cornell Univ., No. 5:15-CV-322, 2016 WL 3212079, at *14 (N.D.N.Y. Feb. 24, 2016)(internal quotation marks and citation omitted).

Defendants argue that Plaintiff cannot make out either an erroneous outcome or a selective enforcement claim. Plaintiff does not respond to Defendants' arguments regarding a selective enforcement claim. He instead focuses on his claim that he has pled sufficient facts to support a finding that the outcome in his case was erroneous and that the error was the result of gender bias. The Court will therefore find that Plaintiff proceeds under an erroneous outcome theory in his Title IX claim and does not attempt to raise a selective enforcement claim.

Defendants contend that Plaintiff has failed to allege sufficient doubts about the outcome of the disciplinary proceeding. Defendants focus on two allegations in Plaintiff's Complaint, that the University "inverted the presumption of innocence" and presumed his guilt and that Syracuse erred in its credibility assessments. Defendants argue that the evidence Plaintiff relies on does not support his claims. Even if he had alleged facts sufficient to create such doubt, Defendants insist, Plaintiff has failed to alleged facts sufficient to establish that gender bias caused the error.

Plaintiff denies that he relies only on the University's alleged failure to provide him a proper presumption of innocence in the proceeding and Syracuse's credibility assessment

15

in alleging an erroneous outcome claim.  He points to a number of allegations he contends demonstrate that the University wrongly concluded that he had engaged in sexual misconduct.  He points particularly at Jacobson's failure to include the results of the SANE tests in his report, as well the conclusions of the Police and the Onondaga County District Attorney.  He contends that the University ignored evidence from the fraternity that showed Roe willingly entering his room, and that Jacobson too willingly accepted Roe's changing story.

A plaintiff who brings an erroneous outcome Title IX claim "must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding."  Yusuf, 35 F.3d at 715.  "If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail."  Id.  Congress did not intend "Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming, absent a claim of selective enforcement."  Id.

> However, the pleading burden in this regard is not heavy.  For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof.  However, allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss. The fatal gap is, again, the lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias.  A plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.  Allegations of a causal connection in the case of university disciplinary cases can be of the kind that are found in the familiar setting of Title VII cases.  Such allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of

> gender.  Of course, some allegations, such as statements reflecting bias by
> members of the tribunal, may suffice both to cast doubt on the accuracy of the
> disciplinary adjudication and to relate the error to gender bias.

Id. (citations omitted); see Columbia Univ., 831 F.3d at 55–56 ("[A] complaint under Title IX,

alleging that the plaintiff was subjected to discrimination on account of sex in the imposition

of university discipline, is sufficient with respect to the element of discriminatory intent, like a

complaint under Title VII, if it pleads specific facts that support a minimal plausible inference

of such discrimination.").  "[T]he inference of discriminatory intent supported by the pleaded

facts [need not] be the most plausible explanation of the defendant's conduct.  It is sufficient

[at the Rule 12(b)(6) stage] if the inference of discriminatory intent is plausible." Columbia

Univ., 831 F.3d at 57.

Plaintiff's factual allegations, related above, are sufficient to cast an articulable doubt

on the outcome of his disciplinary hearing.  He alleges that the University found him guilty of

sexual misconduct that included unwanted touching and inserting an object into Roe's

vagina, despite the fact that other investigators and investigations had found the evidence

insufficient to prove such conduct.  He also alleges that the University and the University's

investigators failed to obtain available exculpatory evidence.  Such allegations cast an

articulable doubt on the outcome of the disciplinary proceeding and are sufficient to state a

claim in that respect.  While Syracuse defends the veracity of the outcome of the

proceeding, the Court here decides a motion to dismiss, and must accept all well-pleaded

allegations in the Complaint as true.  Arguments about how the Court should interpret the

Jacobson's report or the UCB's conclusions are factual disputes that can be resolved after

the completion of discovery.

The question for the Court is now whether Plaintiff has pled facts sufficient to make it

17

plausible that gender was a motivating factor behind the erroneous outcome.

In Columbia University, the Second Circuit vacated a district court's dismissal of a

complaint that alleged that Columbia University had violated Title IX by acting with gender

bias in investigating and suspending a male student for an alleged sexual assault.

Columbia Univ., 831 F.3d at 48.  In reaching this conclusion, the Second Circuit found that

the complaint in that action pleaded "sufficient specific facts giving at least the necessary

minimal support to a plausible inference of sex discrimination to survive a Rule 12(b)(6)

motion to dismiss[.]"  Id. at 56.  The allegations that supported that inference in Columbia

University included:

> (1) the investigator and hearing panel did not seek out all witnesses that the
> plaintiff had identified as sources of information favorable to him; (2) the
> investigator and panel failed to comply with Columbia University's procedures
> designed to protect accused students; (3) the investigator, the panel, and the
> reviewing Dean reached conclusions that were erroneous and contrary to the
> weight of the evidence; (4) during the period before the disciplinary hearing,
> both the student body and public media heavily criticized Columbia University
> and accused it of not taking seriously complaints of female students alleging
> sexual assault by male students; and (5) Columbia University was aware of
> and sensitive to those criticisms.

Rolph v. Hobart & William Smith Colleges, 271 F. Supp. 3d 386, 401 (W.D.N.Y. 2017)(citing

Columbia Univ., 831 F.3d at 56–57).

In terms of gender bias, Plaintiff's Complaint alleges, as explained above, that

Jacobson and the UCB proved more inclined to believe Roe's allegations than his denials.

The Complaint contends that this inclination came in part because of training and

experience that encouraged them to believe the claims of a woman over a man.  That

training, he claims, emphasizes "that women should be presumed credible and any

contradictions or inconsistencies should be disregarded or minimized when assessing the

woman's credibility."  Complt. at ¶ 68.  Plaintiff further alleges that, at the relevant times,

federal action had "created an atmosphere where schools were so scared of violating the

civil rights of alleged victims–and possible lawsuits and/or loss of federal funding–that

schools ended up violating the due process rights of those accused instead."  Id. at ¶ 47.

Plaintiff points to similar pressures from New York State legislation and New York State

officials that limited the rights of the accused in campus sexual assault cases.  Id. at ¶¶ 49-

62.  Syrause was New York's first private university to "endorse" these changes in New York

law.  Id. at ¶ 69.  He also points to investigations from the Department of Education's Office

of Civil Rights in 2016 and a visit to campus from that Office in early 2017.  Id. at ¶¶ 63-64.

He alleges that "the pressure" from these visits and investigations, "combined with the

media attention and public scrutiny" led Syracuse to seek to avoid any situation "where it

was perceived as ignoring a female student's complaint."  Id. at ¶ 65.  Plaintiff alleges that

Roe filed her complaint "a few months after" the Office's visit and after the "trauma-

informed" training that he argues encouraged investigators to believe women over men.  Id.

at ¶ 71.  Plaintiff further alleges that this concern about federal investigations and pressure

to prosecute men led to an increase of sexual-assault cases prosecuted against men at

Syracuse between 2013 and 2017.  Id. at ¶ 136.  He alleges, on "information and belief,"

that "Syracuse has repeatedly conducted gender-biased investigations, conducted unfair

procedures, and imposed disproportionate sanctions against male students accused of

misconduct due to reliance on the 'trauma-informed' approach and victim-centered

approach to investigations."  Id. at ¶ 137.

Plaintiff's allegations that Syracuse assumed that he was guilty because he was a

male accused of sexual assault, and that Syracuse assumed that Roe was truthful because

of her gender, border on being "mere conclusory statements . . . not entitled to the assumption of truth."  Iqbal, 556 U.S. at 678.  Nonetheless, Plaintiff has pointed to flaws in the investigation, assumptions made by investigators, and evidence produced by Police and the District Attorney that supported his claims that he was not responsible which Syracuse ignored.  He also contends that Syracuse accepted Roe's claims, excused her lapses in memory, her changed story, and her implausible claims to have recovered her memories.  Plaintiff's allegations could reasonably be read to support an understanding that the Investigator, the University Conduct Board, the Appeals Board, and other Syracuse officials ignored any evidence or contradictions in Roe's story and refused to investigate any evidence that supported Plaintiff's version of events.  While these issues standing alone "may not necessarily support an inference of bias on account of gender," Plaintiff here, like the plaintiffs in Columbia University and Rolph, has coupled his factual allegations with the allegations of public pressure on the University to prosecute sexual abuse allegations more aggressively.  Rolph, 271 F. Supp. 3d at 402.   As in these other cases, Plaintiff claims his disciplinary proceeding occurred in the context of public criticism of the University's handling of sexual abuse complaints against males.  A reasonable inference could be drawn that Defendant's agents were "motivated to refute [public] criticisms [of Syracuse's handling of sexual abuse allegations] by siding with the accusing female and against the accused male." Columbia Univ., 831 F.3d at  58.   Plaintiff has presented allegations of facts supporting a minimal plausible inference of discriminatory intent. The motion will be denied on this ground.

Defendants argue that Plaintiff misstates the atmosphere on campus, presents allegations taken largely verbatim from other complaints that raise these issues, and

ignores changes in the larger environment that have occurred in the past few years.

Defendants are certainly welcome to challenge Plaintiff's allegations once the parties

develop the facts, but at this stage in the litigation, the Court is required to accept Plaintiff's

well-pleaded allegations as true.  Those allegations provide a sufficient factual basis to find

that Plaintiff has presented sufficient facts to make his right to relief plausible.

### B.      Breach of Contract

Plaintiff's second cause of action alleges breach of contract.  He contends that

Syracuse breached its express and/or implied agreements with him, and that these

"breaches" caused him damage.  Defendants argue that Plaintiff has failed to state a claim.

"'In New York, the relationship between a university and its students is contractual in

nature.'"  Xiaolu Peter Yu v. Vassar College, 97 F. Supp. 3d 448, 481 (S.D.N.Y.

2015)(quoting Papaspiridakos v. Educ. Affiliates, Inc., 2013 WL 4899136, at *3 (E.D.N.Y.

Sept. 11, 2013).  "[A]n implied contract is formed when a university accepts a student for

enrollment: if the student complies with the terms prescribed by the university and

completes the required courses, the university must award him a degree.  The terms of the

implied contract are contained in the university's bulletins, circulars and regulations made

available to the student."  Papelino v. Albany College of Pharm. of Union Univ., 633 F.3d

81, 93 (2d Cir. 2011)(internal quotation marks and citations omitted).

In New York, "[t]he essential elements of a cause of action to recover damages for

breach of contract are the existence of a contract, the plaintiff's performance pursuant to the

contract, the defendant's breach of its contractual obligations, and damages resulting from

the breach."  PFM Packaging Mach. Corp. v. ZMY Food Packing, Inc., 16 N.Y.S. 3d 298,

2015 N.Y. App. Div. LEXIS 6711 at *2 (2d Dept. Sept. 16, 2015). "A student may sue his college or university for breach of an implied contract in certain situations," Routh, 981 F. Supp. 2d at 207, but "[t]he application of contract principles to the student-university relationship does not provide judicial recourse for every disgruntled student." Faiaz v. Colgate Univ., 64 F. Supp. 3d 336, 359 (N.D.N.Y. 2014).

"'[T]o state a valid claim for a breach of contract, a plaintiff must state when and how the defendant breached the specific contractual promise.'" Habitzreuther v. Cornell Univ., No. 5:14cv1229, 2015 WL 5023719, at *4 (N.D.N.Y. Aug. 25, 2015) (quoting Radin v. Albert Einstein Coll. of Medicine of Yeshiva Univ., 2005 WL 1214281, at *10 (S.D.N.Y. May 20, 2005)). Thus, while "[a] college is 'contractually bound to provide students with the procedural safeguards that it has promised,'" Xiaolu Peter Yu, 97 F. Supp. 3d at 481 (quoting Fellheimer v. Middlebury Coll., 869 F. Supp. 238, 243 (D. Vt.1994)), a plaintiff must identify a specific promise or obligation that was breached in order to pursue a contract claim. See Okoh v. Sullivan, 2011 U.S. Dist. LEXIS 18524, at * 14-15 (S.D.N.Y. Feb. 24, 2011) ("the mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted"). "Conclusory allegations that a defendant breached an agreement are insufficient to support a breach of contract claim." Habitzreuther, 2015 WL 5023719, at *5 (N.D.N.Y. Aug. 25, 2015); see Ward v. N.Y. Univ., 2000 WL 1448641, at *5 (S.D.N.Y. Sept.28, 2000)("[B]ald assertions and conclusory allegations claiming that the University's rules or procedures were not followed, do not state a valid claim."); Gally v. Columbia Univ., 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998)("mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted").

Plaintiff's opposition papers point to four ways that Syracuse allegedly violated the "express guarantees of the Student Handbook."  First, Plaintiff argues that the investigation and the UCB's decision were not completed within 60 days of receipt of Roe's complaint. Second, he claims he was denied the Handbook's promise of a right to "participate in a process that is fair and impartial" and offers "adequate notice and meaningful opportunity to be heard."  Third, he argues that he "was deprived of his right 'to fundamental fairness before formal disciplinary sanctions were imposed by the University."  Fourth, he contends that the a breach occurred when he was discriminated against on the basis of his gender.

At the outset, the Court finds that the last three of these alleged breaches are the types of general statements of policy which New York law dictates cannot form the basis of a viable contract claim. See Gally v. Columbia University, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998); *see also* Nungesser v. Columbia Univ., 244 F. Supp. 2d 345, 373 (S.D.N.Y. 2017).[2]  Plaintiff argues that Defendants violated his contractual right to a process that was fair, impartial, and offering adequate notice and a meaningful opportunity to be heard in the way they investigated the complaint, particularly by ignoring exculpatory evidence.  He cites to a case applying Massachusetts law to support his position.  See Doe v. Amherst College, 238 F.Supp.3d 195, 215 (D. Mass. 2017) (judging a breach-of-contract claim under Massachusetts law, which provides that "'[a] breach of contract is established if the facts show that the [college] has 'failed to meet [the student's] reasonable

---

[2]"Nungesser alleges that Columbia breached six policies in its treatment of him [including its "policy concerning fair process to both complainants and respondents in disciplinary investigations and proceedings"]. He also alleges that Columbia violated the duty of good faith and fair dealing. None of these claims withstand scrutiny, however, because Nungesser has not identified the specific promises that Columbia has breached."

expectations.") (quoting <u>Walker v. President & Fellows of Harvard Coll.</u>, 840 F.3d 57, 61-62 (1st Cir. 2016)).  Of course, the Court is applying New York, not Massachusetts law. In New York, provisions that students will be treated in a "fundamentally fair" manner, or in a manner that is consistent with fundamental "student rights," are the sorts of non-actionable statements of general policy that courts applying New York law have held cannot support a breach of contract claim. <u>See, e.g.</u> <u>Ward</u>, 2000 WL 1448641, at *4.[3]  Moreover, Plaintiff's breach of contract claim with respect to "notice" fails because there is no allegation that notice was not provided.  Allegations challenging the adequacy of the notice do not establish a viable breach of contract  claim. <u>See</u> <u>Routh</u>, 981 F. Supp. 2d at 208-210.[4]

As to the first of these alleged breaches of the contract, Plaintiff alleges that the University did not complete the investigation and hearing within sixty days as the Student Handbook required.  He contends that the University had a contractual obligation to complete the investigation in that time period.  Plaintiff relies on the student handbook as it existed in the 2016-2017 school year for this contractual provision.  The provision in question provides that:

> The process of investigation and the Board's decision will be concluded within 60 days of the original complaint, pending special circumstances.  If circumstances arise that delays [sic] either the investigation or the Board' determination of an outcome,

---

[3]"Here, virtually all of the promised services that Ward cites, are broad pronouncements of the University's compliance with existing anti-discrimination laws, promising equitable treatment of all students.  As such, they cannot form the basis for a breach of contract claim."

[4](Rejecting a breach of contract claim where plaintiff admitted receiving notice of the complaint but contended that such notice was insufficient.  The Court noted that plaintiff "has not indicated a particular policy or provision requiring the [University] to provide him with any level of detail or explanation in its decision, nor does the Court find any in the Standards of Student Conduct.")

both parties will be sent written notification of the delay and its cause.  Each party will receive written notification of the decision of the University Conduct Board including a finding of responsibility and sanctions.

Syracuse 2016-2017 Student Handbook, at ¶ 10.10.  Available at

http://studentconduct.syr.edu/_documents/StudentConductSystemHandbook%20-%202017.pdf (consulted 5/13/2020).  Thus, Plaintiff does not have a breach-of-contract claim if the University provided him written notification that the investigation and/or decision would be delayed beyond the 60 days provided in the policy.

Plaintiff's complaint lists several ways that Syracuse allegedly violated the contract embodied by the Student Handbook.  See Compt. at ¶ 170.  Failing to complete the investigation and decision within sixty days is not listed as one of these breaches.  Id. Rather, Plaintiff raises the issue of the lateness of the process in responding to Defendants' motion.  The University points to the Appeals Board's decision, which the Plaintiff relied upon in his pleadings, to argue that Plaintiff was provided notice of the delay and the cause for the delay.  See Exh. 3 to Defendants' Motion to Dismiss, dkt. # 26-4.  The decision states that one ground for Plaintiff's appeal was that the University had exceeded the 60-day period.  The Appeals Board concluded:

> As for the Respondent's complaint that the investigation took longer than the allotted 60-day time period, the Appeals Board notes that Section 10.10 of the 2016-2017 University Student Conduct System Handbook provides that the period is 60 days, "pending special circumstances," and that the parties will be advised if the process will take longer.  In this case, special circumstances included involvement of the Syracuse Police Department and the semester break.  The Title IX office notified the Respondent of delay via email on September 8, 2017, in accordance with Section 10.10.  Further, the Appeals Board notes that the Respondent himself requested that the University move the hearing from November 1, 2017, to November 8, 2017, further delaying the process.  The Appeals Board does not believe that the period beyond 60 days impacted the outcome of the case in any manner adverse to the Respondent, and notes in particular the letter from the District Attorney's office submitted by the Respondent was itself dated November 7, 2017.

25

Id. at 8.

The Court will grant the motion with respect to this alleged breach as well.  Plaintiff does not allege in his Complaint that the University violated its option to provide notice of a delay beyond 60 days.  A document relied on by the Plaintiff indicates that the University provided such notes.  The Court will not, however, grant the motion with prejudice in this respect.  The document Defendants supply only references an email, and the Court has no way of knowing whether the Defendants actually sent the email, and under what circumstances.  Plaintiff may replead his breach-of-contract claim in this sense only if he has a good faith basis for believing that Syracuse did not provide him with notice as required in the Handbook.  Repleading would be futile, however, if Plaintiff did receive an email that informed him of the delay and its causes.

Plaintiff also insists he has pled a claim for breach of the implied contract of good faith and fair dealing.  In New York, all contracts contain an implied covenant of good faith and fair dealing, meaning that neither party will "act arbitrarily or irrationality" in using discretion conferred by the contract terms.  Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 663 N.E. 2d 289, 291 (1995).  Under the rule, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Moran v. Erk, 11 N.Y.3d 452, 456, 901 N.E.2d 187, 190 (2008).  A claim for a breach of the implied contract of good faith and fair dealing is "duplicative" of a "breach of contract [claim]" that "arises from the same set of operative facts."  MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 87 A3d 287, 297 (1st Dept. 2011).  "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled."

Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002).  "[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same fats, the latter claim should be dismissed as redundant."  Cruz v. Fxdirectdealer, LLC, 720 F.3d 115, 125 (2d Cir. 2013).  That situation applies here, and the Court will dismiss any claim for implied breach of the covenant of good faith and fair dealing that Plaintiff alleges to have pled.

### C.    Promissory Estoppel

Defendants also argue that the Court should dismiss Plaintiff's third cause of action, which alleges promissory estoppel.  Promissory estoppel does not apply when the parties, as here, have a contractual relationship, Defendants contend.  In any case, they argue, the promises Plaintiff cites are too vague too constitute any sort of promissory estoppel claim.

Under New York law, a claim for promissory estoppel requires "'(1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) injury sustained in reliance on the promise.'"  Gurreri v. Associates Ins. Co., 669 N.Y.S.2d 629, 631 (2d Dept. 1998) (quoting Rogers v. Town of Islip, 230 A.D. 2d 727, 727 (2d Dept. 1996)).  Promissory estoppel applies "in two situations."  Merex A.G. v. Fairchild Weston Sys., 29 F.3d 821, 824 (2d Cir. 1994).  "First, and most traditionally, the doctrine allows for the enforcement of a promise in the absence of bargained-for-consideration."  Id.  Promissory estoppel in that respect applies when "'the promisor should reasonably expect to induce action or forebearance on the part of the promisee or a third person and which does induce such action or forebearance[.]'"  Id. (quoting RESTATEMENT (SECOND) OF CONTRACTS § 90).  Courts term this theory "detrimental reliance."  Id.  Second, "[p]romissory estoppel has become increasingly available to provide relief to a party where

the contract is rendered unenforceable by operation of the Statute of Frauds." Id.
"Promissory estoppel is 'a rule applicable only in the absence of an enforceable contract.'"
Holmes v. Lorch, 329 F.Supp.2d 516, 527 (S.D.N.Y. 2004) (quoting Cyberchron Corp. v.
Callidata Systems Development, Inc., 831 F.Supp. 94, 112 (S.D.N.Y. 1993)).

Plaintiff's Complaint alleges that "[u]pon enrollment at Defendant Syracuse, and at all
times relevant hereto, a contractual relationship existed between Defendant Syracuse and
JOHN DOE through Defendant Syracuse's Polices and procedures governing the student
disciplinary system, including but not limited to the Code of Conduct."  Complt. at ¶ 162.
Plaintiff's promissory estoppel claim alleges that "Syracuse's Policies constitute
unambiguous representations and promises that Syracuse should have reasonably
expected to induce action or forebearance on the part of" the Plaintiff."  Id. at ¶ 175.
Plaintiff contends that the promises upon which Syracuse should have expected him to rely
were: "the opportunity to attain his educational objectives, to have his health, safety, welfare
and human rights protected, to have any claims brought against him under the Campus
Code of Conduct be heard by an impartial and objective panel, to be free from
discrimination, and to have complaints resolved impartially and promptly."  Id. at ¶ 176.

The Court will grant Defendants' motion in this respect.  The Court is unpersuaded
by Plaintiff's argument that, since the Court has found that Plaintiff has not stated a contract
claim, that the Court must conclude that he has a promissory estoppel cause of action
based on the same facts.  The Court has found the existence of a contract, but has
concluded that Plaintiff has not alleged that a breach occurred.  The promises on which
Plaintiff bases his promissory estoppel claim are promises that Syracuse allegedly made in
the Code of Conduct, which are the promises on which Plaintiff alleges a contract claim.  In

28

any case, the promises Plaintiff alleges in his promissory estoppel claim are vague and general, and not the sort of specific promise that "'the promisor should reasonably expect to induce action or forebearance on the part of the promisee or a third person and which does induce such action or forebearance[.]'" Merex A.G., 29 F.3d at 824(quoting Restatement (Second) of Contracts § 90).  Plaintiff has failed to state a promissory estoppel claim and the Court will grant the motion in this respect as well.

## V.     CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss Plaintiff's Complaint, dkt. # 26, is hereby **GRANTED in part** and **DENIED in part**.  Defendants' motion is denied with respect to Plaintiff's erroneous investigation Title IX claim (Count One), granted with leave to re-plead with respect to Plaintiff's contract claim (Count Two) insofar as Plaintiff attempts to allege that Defendants failed to provide proper notice that the investigation and UCB decision would not be completed within sixty days, and granted with prejudice with respect to Plaintiff's promissory estoppel claim (Count Three), which is **DISMISSED**.  If Plaintiff elects to re-plead his contract claim in the way describe by the Court, he shall file an Amended Complaint within 21 days of the date of this Order.[5]  If Plaintiff fails to file an Amended Complaint within the time specified in this Order, the Court will deem Plaintiff's contract claim dismissed with prejudice.

─────────────────────

[5]If Plaintiff elects to re-plead, he must assert sufficient factual allegations directed to the deficiencies addressed above.  See FED. R. CIV. P. 11(b)(3)("By presenting to the court a pleading, . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.").

**IT IS SO ORDERED.**

Dated: May 15, 2020

Thomas J. McAvoy
Senior, U.S. District Judge