UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

JOHN DOE,

                 Plaintiff,

         -against-

SYRACUSE UNIVERSITY, KENT
SYVERUD, individually and as agent for
Syracuse University, PAMELA PETER,
individually and as agent for Syracuse
University, SHEILA JOHNSON-WILLIS,
individually and as agent for Syracuse
University, and BERNERD JACOBSON,
individually and as agent for Syracuse
University

               Defendants.

------------------------------------------------------------ x

Case No. 19-cv-1467-TJM-ATB

**AMENDED COMPLAINT**

JURY TRIAL DEMANDED

        Plaintiff JOHN DOE ("Plaintiff" or "Doe"), by and through undersigned counsel ChaudhryLaw PLLC, as for his Complaint against Defendants alleges as follows:

## NATURE OF THE ACTION

        1.     This is an action for Title IX violations and breach of contract arising from the injurious actions taken by Defendants Syracuse University, Kent Syverud, Pamela Peter, Sheila Johnson-Willis and Bernerd Jacobson (hereafter collectively, "Defendants") in failing to follow proper protocols under Title IX, conducting an inadequate and biased investigation into a sexual assault complaint filed by JANE ROE[1] against Plaintiff JOHN DOE, erroneously adjudicating the complaint, and wrongfully expelling JOHN DOE despite his previously unblemished disciplinary record.

---

[1] To protect the identity of the complainant, she will be referred to throughout as Jane Roe.

2.     JOHN DOE's dream of graduating from Defendant Syracuse University (hereafter "Defendant Syracuse") was destroyed as a result of a disciplinary case based on false accusations of sexual assault that both the police and district attorney's office emphatically stated did not occur. Defendant Syracuse expelled DOE after conducting a flawed and biased investigation that failed to meet any standards, let alone the standards set forth by the United States Constitution, federal and state laws, and Defendant Syracuse's Code of Conduct.

3.     In April 2017, JANE ROE and DOE were students at Defendant Syracuse.  On April 22, 2017, JANE ROE attended a party at the Delta Kappa Epsilon ("DKE") fraternity house. DOE was a member of DKE and resided in a room in the fraternity house.  DOE and JANE ROE interacted during the course of the party.  JANE ROE spent the night in DOE's room.  Both DOE and JANE ROE recall waking in DOE's room on the morning of April 23, 2017, fully clothed. Neither JANE ROE nor DOE recalled what occurred the night before.

4.     Nonetheless, on April 24, 2017—26 hours after leaving DOE's fraternity house— JANE ROE went to Crouse Hospital to complain of a possible sexual assault.  At that time, a Sexual Assault Nurse Examination ("SANE") was conducted, and during the course of the examination, JANE ROE stated: "I think I might have been drugged because I don't remember much."  The SANE produced no evidence to corroborate a sexual assault; no evidence of any intoxicants in her bloodstream other than caffeine and marijuana; and DNA analysis of JANE ROE's vagina was negative for male DNA.

5.     JANE ROE stated to numerous individuals that she did not recall the events of the night of April 22, 2017 and the morning of April 23, 2017, and that she could not say what did and did not occur.  These included statements to: nurses at Crouse Hospital during the SANE; her friends in the days following the alleged occurrence, as reflected in witness statements; Detective

Michael Bates ("Detective Bates") from the Syracuse Police Department ("SPD"); Assistant District Attorney Maureen Barry ("ADA Barry") of the Onondaga County District Attorney ("OCDA"); and Defendant Bernerd Jacobson ("Defendant Jacobson")—Defendant Syracuse's Title IX Investigator.  To all of these parties, JANE ROE stated, in sum and substance, that she had no recollection of what happened that night.

6.      Beginning a few days after the night in question, both the SPD and OCDA conducted independent investigations into JANE ROE's allegations.  Both concluded there was no evidence of a sexual assault.  In fact, ADA Barry of the OCDA has definitively stated: "[t]here is no corroborating evidence to support allegations of a sexual assault….There is also no physical evidence from the SANE to corroborate a sexual assault."  A redacted copy of the OCDA report issued by ADA Barry is annexed hereto as ***Exhibit A*** and incorporated herein by reference.  ADA Barry concluded: "**After a full and thorough investigation by our office and the detectives with the Syracuse Police Department, it is impossible to determine what, if anything, occurred that evening between [JANE ROE] and [DOE].  There is no credible proof of any sexual conduct in this case, consensual or non-consensual.**" ***Exhibit A*** (emphasis added).

7.      Despite the lack of any evidence of a sexual assault—or indeed, a sexual encounter whatsoever—and JANE ROE's repeated statement that she could not recall what happened on the night of April 22, 2017, into the early morning hours of April 23, 2017, on June 2, 2017, JANE ROE filed a complaint with Defendant Syracuse's Equal Opportunity, Inclusion, and Resolution Services alleging DOE sexually assaulted her.

8.      Defendant Syracuse assigned Defendant Jacobson to conduct an investigation under Title IX pursuant to Defendant Syracuse's Code of Conduct.  Subsequently, during the investigation, JANE ROE told many different versions of what she alleged happened that night.

Despite these glaring inconsistencies, and notwithstanding the fact that she told many others that she had no recollection, Defendant Jacobson's report states "On balance, Complainant is assessed as credible and the information she provided reliable, though limited by her lack of memory."

9. What followed was an investigation in which Defendant Syracuse consistently and steadfastly violated JOHN DOE's rights and engaged in violations of federal law, state law, and Defendant Syracuse's own policies and procedures. Defendants' wrongful actions include but are not limited to:

(i) Defendants ignored the evidence, or lack thereof;

(ii) Defendants followed a "trauma-informed" approach, which favors women;

(iii) Defendants relied upon a gender-biased investigative report produced by a partial investigator who acted improperly and disregarded the changes in, and inconsistencies of, JANE ROE's story;

(iv) Defendants evidenced a gender bias against JOHN DOE (as the male accused of sexual misconduct) throughout the investigative process;

(v) Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic;

(vi) Defendants failed to afford JOHN DOE the requisite presumption of innocence required by a preponderance of the evidence standard;

(vii) Defendants deprived JOHN DOE of the opportunity to confront and cross-examine his accuser, or any witnesses;

(viii) Defendants failed to complete their investigation and determination into

JANE ROE's complaint within 60 days, in violation of Defendant Syracuse's Student Conduct System Handbook; and

(ix) Defendants failed to **promptly** notify JOHN DOE of any delay in the investigation, or upon information and belief, provide an adequate and truthful basis for the failure to complete the investigation within the required time frame.

10. Despite the police and district attorney's affirmative statements that there was no evidence of any sexual contact, yet alone sexual assault, JOHN DOE was found "responsible" by Defendant Syracuse's Conduct Board and expelled from Defendant Syracuse. This false conviction and punishment were upheld on appeal by Defendant Syracuse's Appeals Board.

11. Accordingly, JOHN DOE brings this action to obtain relief based on causes of action for violation of Title IX of the Education Amendments of 1972 and breach of contract.

12. DOE has been irreparably harmed by Defendants' conduct and seeks damages to remedy the emotional, mental, and economic harm caused by Defendants' actions.

## PARTIES

13. Plaintiff JOHN DOE is a natural person who currently resides in Morris County, New Jersey, and at all relevant times, was over the age of 18. During the events described herein, JOHN DOE was a student at Defendant Syracuse and resided in Syracuse, New York.

14. Defendant Syracuse University is a private university located in Syracuse, New York.

15. Upon information and belief, Kent Syverud ("Defendant Syverud") is a resident of the State of New York and was the Chancellor and President of Defendant Syracuse and a voting member of the Defendant Syracuse Board of Trustees at all relevant times herein.

16.     Upon information and belief, Pamela Peter ("Defendant Peter") is a resident of the State of New York and was Assistant Dean/Director of the Office of Student Rights and Responsibilities at Defendant Syracuse at all relevant times herein.

17.     Upon information and belief, Sheila Johnson-Willis ("Defendant Johnson-Willis") is a resident of the State of New York and was the Interim Chief, Equal Opportunity and Title IX Officer at Defendant Syracuse at all relevant times herein.

18.     Upon information and belief, Bernerd Jacobson is a resident of the State of New York and was an Equal Opportunity and Title IX Investigator at Defendant Syracuse at all relevant times herein.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action, pursuant to (i) 28 U.S.C § 1331, because claims arose under the Constitution and the laws of the United States, and (ii) 28 U.S.C. § 1332 (diversity), as Plaintiff and Defendants are residents of different states, New Jersey and New York, respectively, and as the amount of damages at issue exceeds $75,000.00 (seventy-five thousand dollars) exclusive of interest and costs.

20.     This Court has personal jurisdiction over Defendant Syracuse on the ground that it is conducting business within the State of New York and the Northern District of New York.

21.     This Court has personal jurisdiction over Defendant Syverud on the grounds that he was an employee of Defendant Syracuse at all relevant times herein and personally acted within the State of New York and the Northern District of New York.

22.     This Court has personal jurisdiction over Defendant Peter on the grounds that she was an employee of Defendant Syracuse at all relevant times herein and personally acted within the State of New York and the Northern District of New York.

23.    This Court has personal jurisdiction over Defendant Johnson-Willis on the grounds that she was an employee of Defendant Syracuse at all relevant times herein and personally acted within the State of New York and the Northern District of New York.

24.    This Court has personal jurisdiction over Defendant Jacobson on the grounds that he was an employee of Defendant Syracuse at all relevant times herein and personally acted within the State of New York and the Northern District of New York.

25.    Venue properly lies in this district, pursuant to 28 U.S.C. § 1391(b), because the events or omissions giving rise to the claim occurred in this judicial district.

**FACTS**

*A.  DOE's Background*

26.    JOHN DOE was born and raised in West Orange, New Jersey.  DOE graduated from West Orange High School in 2014.  Following high school graduation, DOE matriculated at Defendant Syracuse University, his dream school.  DOE studied civil engineering and was enrolled in an accelerated program for his Master in Business Administration ("MBA")—an extremely selective program in which only six students in the class were admitted.  DOE maintained a 3.1 GPA and was on track to graduate with his bachelor's degree in 2018 and an MBA in 2019.

27.    During his time at Syracuse, DOE became a member of Defendant Syracuse's chapter of the Delta Kappa Epsilon fraternity.  From Fall 2015 to Fall 2017, DOE resided in the DKE fraternity house located at 703 Walnut Avenue, Syracuse, New York 13210.  In Spring 2016, DOE was elected President of the Syracuse University chapter of the DKE fraternity.

28.    At the time of the alleged incident—April 22-23, 2017—DOE was a junior at Syracuse University.  DOE was only seven credits shy of graduation at the time of his expulsion in November 2017.

29.     Prior to the alleged incident in April 2017, DOE never had any disciplinary problems at Defendant Syracuse; he has no criminal history and has never been arrested.

**B.  *Night of April 22, 2017 -- Morning of April 23, 2017***

30.     On April 22, 2017, DKE was hosting a joint party with the Kappa Kappa Gamma ("KKG") sorority; JANE ROE was a member of KKG and a participant at the party.  The event was scheduled to begin at approximately 11:00 p.m.  JANE ROE and other women from KKG sorority arrived a few hours early to "pregame[2]" in a room on the second floor of the DKE fraternity house.  DOE also participated in the second floor "pregame," and both JANE ROE and DOE consumed alcohol during the pregame and were talking to one another.  JANE ROE and DOE were acquaintances before this night.  They had never dated and had no prior sexual interaction.

31.     After participating at the "pregame" for approximately two hours on the second floor, both DOE and JANE ROE went downstairs to the party where alcohol was also being served. One of the witnesses to the investigation indicated that they observed JANE ROE and DOE kissing on the dance floor of the party.  Surveillance video from the DKE house shows that at approximately 12:21 a.m. on April 23, 2017, JANE ROE followed DOE to his room.  As seen on the surveillance video, JANE ROE walked a few feet behind DOE, and entered his room after him, voluntarily.

32.     Both DOE and JANE ROE awakened later in the morning, on April 23, 2017, in DOE's room, fully clothed and with no apparent recollection of what had occurred after midnight.

---

[2] The definition of "pregame" according to Merriam-Webster Dictionary is "to begin drinking alcohol before an event or activity (such as a party or a night out)."

Surveillance video shows JANE ROE leaving DOE's room at approximately 10:30 a.m. in no apparent distress.

33.     On April 24, 2017, JANE ROE went to Crouse Hospital for a SANE and requested a battery of tests, including urine samples and DNA tests. (The results of those tests came many days later, and are discussed below.). The SANE showed no sign of any sexual contact or bodily fluids, and no injuries to JANE ROE's anus.

### C. Syracuse Police Department and Onondaga District Attorney's Office Investigation

34.     On April 27, 2017, JANE ROE first contacted the SPD complaining that she may have been sexually assaulted.  Detective Bates from the SPD and ADA Barry from the OCDA were assigned to investigate.  Detective Bates first interviewed JANE ROE on May 1, 2017, at which time she stated, "halfway through the night, she 'blacked out' and doesn't remember anything after 12:30 a.m. on April 23, 2017."

35.     *Again* on May 4, 2017, Detective Bates interviewed JANE ROE to see if she could recall any other events on the evening in question and she stated that she could not.  Subsequently on May 10, 2017, she was *again* interviewed by Detective Bates and shown the surveillance video from the hallway of the fraternity house; JANE ROE stated that she "did not recall going to DOE's room" and did not know what happened after midnight of the night in question.

36.     Detective Bates later received the forensic toxicology report from Crouse Hospital taken from JANE ROE's urine sample on April 24, 2017.  That report indicated that the only items present in her bloodstream at the time of the analysis were caffeine and marijuana; no other drugs or intoxicants were detected.

37.     DOE willingly—and without counsel—met with Detective Bates, was completely forthcoming, and answered all questions posed to him. Detective Bates had the opportunity to make his own credibility determination of DOE.

38.     Following DOE's meeting with Detective Bates, and unbeknownst to DOE, the detective coordinated a recorded "controlled call" between JANE ROE and DOE. The purpose of this call was to surreptitiously gather any evidence against DOE in the form of statements or confessions by him to JANE ROE.  This call proved fruitless, as DOE had nothing to confess and—as he has always maintained—he has no recollection of that night.

39.     Based on 1) the lab results showing no indication of any incapacitating drugs in her system, 2) the fact that she had no recollection of the events of the night in question, 3) the controlled call which was consistent with DOE's statements and the evidence here, and 4) no physical evidence of sexual assault from the SANE, SPD closed this case as Detective Bates believed there was no evidence that a sexual assault occurred.  Detective Bates forwarded his report to ADA Barry.

40.     ADA Barry subsequently issued her own report based on the investigation by OCDA and SPD, as well as her own interview of JANE ROE, her own review of all police reports and medical records of JANE ROE, and her own review of the results of the SANE.  *Exhibit A*. The comprehensive report drafted by ADA Barry stated: "there is no corroborating evidence to support allegations of a sexual assault….there is also no physical evidence from the SANE to corroborate a sexual assault." *Exhibit A*.   ADA Barry also stated that DNA analysis following the SANE resulted in negative results for male DNA.  *Exhibit A*.  Furthermore, ADA Barry wrote that "[JANE ROE] has stated repeatedly that she has no direct knowledge of any sexual acts that she may have engaged in with [DOE]." *Exhibit A*.  Lastly and importantly, ADA Barry stated:

[JANE ROE]'s lack of memory and the lack of any witnesses to this incident make it impossible to prove that she articulated an unwillingness to act upon any sexual conduct that may have occurred…I have personally reviewed all of the evidence in this case. **After a full and thorough investigation by our office and the detectives with the Syracuse Police Department, it is impossible to determine what, if anything, occurred that evening between [JANE ROE] and [DOE]. There is no credible proof of any sexual conduct in this case, consensual or non-consensual. As a prosecutor sworn to pursue justice, it would be unethical for me to charge [DOE] with a crime based on these facts and circumstances.**

*Exhibit A* (emphasis added).

41.     SPD and OCDA closed the case against DOE without filing any charges against him.

### D. Pertinent Title IX and Other Legislative History

42.     On April 11, 2011, the United States Education Department's Office of Civil Rights ("OCR") sent a "Dear Colleague Letter" to colleges and universities indicating that in order to comply with Title IX, colleges and universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct. That letter is attached herein as *Exhibit B*.

43.     The Dear Colleague Letter required schools to adopt a low burden of proof—"more likely than not"—in evaluating claims of sexual misconduct.

44.     The Dear Colleague Letter also stated that schools should "minimize the burden on the complainant" and focus more on victim advocacy, thus emphasizing the rights of the accuser over the accused.

45.     OCR subsequently pressured colleges and universities to aggressively pursue investigations of sexual assaults on campus. Many colleges and universities feared being investigated or sanctioned by the Department of Education, or worse, removal of federal funding.

46.     In fact, in the summer of 2014, Catherine E. Lhamon, the Assistant Secretary of Education who headed OCR, announced: "I will go to enforcement, and I am prepared to withhold federal funds."

47.     However, this created an atmosphere where schools were so scared of violating the civil rights of alleged victims—and possible lawsuits and/or loss of federal funding—that schools ended up violating the due process rights of those accused instead.

48.     The Federal Government thus exerted pressure on colleges and universities to treat those accused of sexual misconduct with a presumption of guilt.

49.     In July 2015, New York State Governor Andrew Cuomo signed into law Education Law Article 129-B, commonly known as "Enough is Enough," which is legislation to combat sexual assault on college campuses.

50.     Under "Enough is Enough," institutions are required to note on the student's transcript if the student is found responsible of sexual assault or sexual misconduct.

51.     "Enough is Enough" was passed, *inter alia*, to provide an allegedly fair and consistent administrative process to higher-education students accused of sexual assault, domestic violence, dating violence or stalking.  It applies to all public and private institutions of higher education in the State of New York. It mandates that all such institutions adopt certain rules and procedures in connection with their sexual misconduct policies.

52.     "Enough is Enough" mandates that each institution file with the State a certificate of compliance with the law, and well as a copy of all written rules and policies adopted in accordance with the statute. If any institution fails to file a certificate of compliance, it will be ineligible to receive state aid or assistance until such time as it files the certificate.

53.     "Enough is Enough" also requires the State to conduct random audits to ensure compliance with the provisions of the statute.

54.     "Enough is Enough" also mandates that all New York State institutions of higher education implement, among other things: a specific, State-affirmed student bill of rights and a specific, State-affirmed response to reports of alleged misconduct.

55.     "Enough is Enough" provides students accused of sexual assault, domestic violence, dating violence or stalking with the "right to a process in all student judicial conduct cases…that includes, *at a minimum* … an opportunity to … present evidence and testimony at a hearing, where appropriate, and have access to a full and fair record of any such hearing, which shall be preserved and maintained for at least five years from such a hearing . . . ." NY Educ. L. § 6444(5)(b).

56.     "Enough is Enough" also mandates that the accused has a right to "a prompt response to any complaint and to have the complaint investigated and adjudicated in an impartial, timely and thorough manner by individuals who receive annual training in conducting investigations of sexual violence…**including the right to a presumption that the respondent is 'not responsible.'**" NY Educ. L. § 6444(5)(c)(ii) (emphasis added).

57.     "Enough is Enough" further requires an "investigation and process that is fair, impartial and provides a meaningful opportunity to be heard, and that is not conducted by individuals with a conflict of interest." NY Educ. L. § 6444(5)(c)(iii).

58.     Finally, "Enough is Enough" gives all students the right "to review and present available evidence in the case file, or otherwise in the possession or control of the institution, and relevant to the conduct case[.]"NY Educ. L. § 6444(5)(c)(iv).

59.     Nevertheless, "Enough is Enough," by its express terms, affords greater rights to reporting individuals than accused individuals.

60.     For example, the mandatory student bill of rights requires that a reporting individual "[b]e free from any suggestion that [she] is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations." NY Educ. L. § 6443.

61.     Not only does this presuppose the existence of a "crime or violation," it omits any concurrent right of the accused to be free from the suggestion that he is at fault, or should have acted in a different manner.

62.     The statute also requires institutions to provide multiple forms of assistance to reporting individuals, including assistance obtaining an order of protection against the accused (a civil proceeding which takes place in the courts of New York State).

63.     In 2016, Defendant Syracuse was the subject of at least two publicly known investigations by OCR for having an inadequate response to a complaint of sexual assault. In each of these instances, Defendant Syracuse was alleged to have failed to respond, "promptly and equitably" to a "report[s] of sexual assault."

64.     Officials from OCR visited Defendant Syracuse on January 24 and 25, 2017. At this time, Defendant Syracuse's administration officials sought to emphasize their actions to appease OCR. Further, OCR officials had two community meetings with students and faculty in which OCR sought opinions on the sufficiency of Defendant Syracuse's responses to sexual assault allegations.

65.     Because of the pressure of OCR's investigations and visits, combined with the media attention and public scrutiny, Defendant Syracuse did not want another case where it was perceived as ignoring a female student's complaint.

66.     On January 27, 2017, faculty and staff members of Defendant Syracuse, including those responsible for investigating and/or adjudicating complaints under Title IX, participated in a training that was characterized by Defendant Peter as a so-called "trauma-informed investigation and adjudication" process.   (See https://news.syr.edu/2017/02/university-faculty-staff-receive-training-on-investigating-complaints-of-sexual-violence-title-ix-compliance/ ). Upon information and belief, Defendant Jacobson and members of the Syracuse University Hearing Board participated in this training.

67.     This training was conducted by Debbie Osgood, the former National Enforcement Director for OCR, and is mandated by federal and New York State law.  OCR's pamphlet regarding this training has specifically linked this "trauma-informed" approach to the protection of "girls and women." https://www.nasmhpd.org/sites/default/files/FedPartnersOCR.pdf ("Sexual harassment and sexual violence against girls and women is a real and serious problem in education at all levels…Lack of education on and ineffective methods of combating sexual harassment and violence may create unsafe learning environments for women and girls, in particular.")

68.     Upon information and belief, during this "trauma-informed" approach training, investigators and adjudicators were taught to believe that women complainants were particularly vulnerable.  In fact, despite the lack of any scientific support, this "trauma-informed" approach training taught that inconsistencies in a complainant's story are a direct result of trauma, and inconsistencies are the natural derivative of being a sexual assault victim. Simply, this training

directs that women should be presumed credible and any contradictions or inconsistencies should be disregarded or minimized when assessing the woman's credibility.

69.     In 2017, Defendant Syverud stated that he is "proud that Syracuse University was the first private university in New York State to endorse 'Enough is Enough,'" and that he is "pleased with the progress the community has made in recent years."

70.     Further, in 2017, Defendant Syverud admitted that Syracuse has engaged in "aggressive efforts to crack down on campus sexual assaults," "re-emphasized" the university's commitment to fighting sexual assault, and stated that the school has been committed to "exceeding" legal and regulatory requirements.

71.     A few months after OCR's visit and the aforementioned "trauma-informed" approach training, JANE ROE filed the complaint with Defendant Syracuse.

72.     This is the backdrop under which Defendant Syracuse investigated JANE ROE's complaint.

### E. Defendant Syracuse's Policies

73.     Upon his acceptance to Defendant Syracuse, DOE was provided online access to copies of Defendant Syracuse's school policies, including the Student Conduct System Handbook ("Handbook"), the Code of Conduct (the "Code"), and the Sexual and Relationship Violence Resource Guide for Defendant Syracuse students ("SRV Resource Guide"). The Handbook, the Code and the SRV Resource Guide are collectively called the "Policies."

74.     These Policies set forth the procedures by which Syracuse students who have been accused of violating one or more of the enumerated Policies are investigated, heard, and, possibly, disciplined.

75. In response to "Enough is Enough," the Policies were revised and reissued prior to DOE's junior year at Syracuse, but he was not provided with the new sexual misconduct prevention and education online initiatives required for new first year students.

76. Therefore, the relationship between JOHN DOE and Defendant Syracuse is governed by the Student Conduct System Handbook for the 2016-2017 Academic Year, a copy of which is annexed hereto as ***Exhibit C***.

77. The Student Conduct System Handbook constitutes a contract between students and Defendant Syracuse and, in particular, between JOHN DOE and Defendant Syracuse.

78. A copy of the Student Conduct System Handbook is provided (or available) to each student.

79. The Student Conduct System Handbook includes the Code of Student Conduct and the Conduct System Procedures.

80. The Student Conduct System Handbook also contains a section titled "Syracuse University Policy On Sexual Assault, Sexual Harassment, Stalking Or Relationship Violence (the 'Sexual Misconduct Policy')."

81. The Sexual Misconduct Policy prohibits, *inter alia*, harassment, sexual assault, and relationship violence.

82. The Sexual Misconduct Policy substantially limits an accused student's rights during the disciplinary process, notwithstanding the oftentimes more serious nature of the charges considered under this Policy -- namely, sexual misconduct, including sexual assault and rape.

83. The University's Policies do, however, provide Syracuse students with several important rights, none of which DOE was ultimately afforded in the instant matter:

a. the right to "participate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard" (*Bill of Rights*, ¶4);

b. the right "not to be discriminated against by any agent or organization of Syracuse University" on the basis of their gender (*Student Rights and Responsibilities*, 2 ("Non-Discrimination");

c. "a right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct—as provided in the published procedures of the University's Student Conduct System or other official University publications" (*Student Rights and Responsibilities*, 9 ("Fundamental Fairness"); and

d. the conclusion of any investigation and the Board's decision "within 60 days of the original complaint, pending special circumstances. If circumstances arise that delays either the investigation or the Board's determination of an outcome, both parties will be sent written notification of the delay and its causes." (*Student Conduct System Procedures 10.10*)

84. The Bill of Rights makes clear that Defendant Syracuse has a adopted a biased, "victim centered" approach aimed at believing and supporting the accuser regardless of the results of any investigation or adjudication. There are many rights that apply only to the complainant, such as the right to "be treated with dignity and to receive from the institution courtesy, fair and respectful health care and counseling services where available;" the right to be "free from any suggestion that the reporting individual is at fault where crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violation;" and the right to

"describe the incident to as few institutional representatives as practicable and not be required to unnecessarily repeat a description of the incident."

85.     Defendant Syracuse also maintains a web page for the Office of Equal Opportunity, Inclusion, and Resolution Services, which handles all Title IX investigations. This web page describes the "rights" of students, but only refers to the "rights and responsibilities" of those filing a complaint. Notably, there is no mention of any rights for accused students.

**F.  *JANE ROE's Complaint and Defendant Syracuse's Title IX Investigation***

86.     JANE ROE filed a formal Complaint with Defendant Syracuse and the Office of Equal Opportunity, Inclusion, and Resolution Services on June 2, 2017, alleging that DOE violated the Student Code of Conduct in his actions on April 22-23, 2017, despite her lack of recollection of the evening in question.

87.     Prior to the filing of the formal Complaint on June 2, 2017—through JANE ROE's communications with a student assistance counselor—Defendant Jacobson was assigned as the Title IX investigator for this matter. Defendant Syracuse's web page includes Defendant Jacobson's biography, which states he has a background as a "Special Victims' Counsel" assisting, advising, and protecting the rights of victims of sexual assault. This is not the biography of a neutral and unbiased investigator. His biography is attached herein as ***Exhibit D.***

88.     The investigation formally commenced on June 2, 2017 upon Defendant Jacobson meeting with JANE ROE to take a formal Complaint.

89.     Part 10 of the Student Conduct System Handbook contains Defendant Syracuse University's policies regarding Title IX complaints involving sexual assault allegations. More specifically, Section 10.10 of the Student Conduct System Handbook requires that "the process of investigation and the Board's decision will be concluded within 60 days of the original complaint,

pending special circumstances. If circumstances arise that delays either the investigation or the Board's determination of an outcome, both parties will be sent written notification of the delay and its causes."

90.    Therefore, the investigation into JANE ROE's complaint and Board's decision in this matter was due by August 1, 2017—60 days after ROE filed the formal Complaint.

91.    However, it was not until July 10, 2017—38 days after ROE filed the formal Complaint—that JOHN DOE was even first notified of the Title IX complaint and investigation. On that date, DOE received formal notification from Syracuse University that he is alleged to have violated three sections of the Code of Student Conduct: (i) Code 1) Physical harm or threat of physical harm to any person or persons, including, but not limited to: assault, sexual abuse, or other forms of physical abuse; (ii) Code 3) Conduct- whether physical, verbal or electronic, oral, written or video- which threatens the mental health, physical health, or safety of any person or persons including, but not limited to, hazing, drug or alcohol abuse, bullying, or other forms of destructive behavior; and (iii) Code 15) Violation of University policies, rules, or regulations that are published in the Student Handbook or other official University publications or agreements. [Referring to:] Syracuse University Police on Sexual Assault, Sexual Harassment, Stalking or Relationship Violence and/or Information Technology Resources Acceptable Use Police. The formal notification from Defendant Jacobson on behalf of Defendant Syracuse indicated that Defendant Syracuse was conducting its own Title IX investigation pursuant to Syracuse University's Code of Student Conduct.

92.    The investigation (if you can call it that) was tainted by investigator bias from its inception. Defendant Jacobson—due to his background in assisting, advising, and protecting the rights of victims of sexual assault—went into the investigation with biased preconceptions

concerning DOE's presumed guilt (rather than his presumed innocence), and JANE ROE's presumed reliability (despite the multiple contradictory and inconsistent statements JANE ROE gave throughout the proceedings).

93. In short, Defendant Jacobson acted not as a neutral investigator, but an advocate developing a case for the "victim."

94. JANE ROE initially informed Defendant Jacobson that she had no memory of entering DOE's room that night, or anything that followed until she awakened several hours later. This is the exact same thing she said at least *four times* previously, including to Detective Bates of the SPD.

95. Even when JANE ROE first met Defendant Jacobson, she stated that she could not recall what happened that night. However, weeks later—and for the first time—JANE ROE claimed to Defendant Jacobson that she began to experience sudden flashes of memories following a visit to a therapist, and miraculously was able to describe fragmented memories of having sexual intercourse with DOE, and being sodomized by DOE without her consent.

96. Despite any supporting medical or physical evidence, Defendant Jacobson credited JANE ROE's contrived recollection. Defendant Jacobson inexplicably treated JANE ROE's testimony as consistent and reliable despite these glaring inconsistencies. Defendant Jacobson never spoke with the detective, assistant district attorney, or SANE nurse who all previously met with JANE ROE regarding the night in question. Defendant Jacobson did not bother to inquire with Detective Bates regarding the detective's opinion of DOE and his credibility during the SPD's investigation, which included an interview of DOE and a "controlled call" by JANE ROE to DOE.

97. Having made up his mind, and already predisposed to believe any "victim," Defendant Jacobson subsequently met with DOE. Unlike JANE ROE, DOE has never wavered in

his account of that night—he has no memory of what happened, and certainly no memory of a sexual encounter with JANE ROE.

98.     Defendant Jacobson subsequently evaluated the credibility of both JANE ROE and DOE in his report.

99.     The following is what Defendant Jacobson wrote about DOE's credibility: "The conflicting information noted above raises some concern about the reliability of the information he provided and he simply lacks memory for most of the time in his room the night of April 22 (as does Complainant); overall, he appears credible but provided limited information about the course of events."

100.     Contrast that description of DOE with Defendant Jacobson's description of JANE ROE's credibility: "She has been transparent and spoken with great candor about what occurred and what she believes occurred, being careful to distinguish what she knows from what she believes.  Complainant has expressed some uncertainty and confusion, there is some concern over whether she is remembering details of what happened or re-creating what happened; however, no attempt to fabricate or fill in details is apparent.  In fact, she states as uncertain aspects of the night for which she lacks definite memory specifically, the memory fragment where she assumes that sex was happening because of the way her head was repeatedly hitting the wall but does not recall anything from the waist down.  On balance, Complainant is assessed as credible and the information she provides reliable, though limited by her lack of memory."

101.     In essence, Defendant Jacobson states that DOE is not reliable because he cannot recall details of the night in question, but then credits JANE ROE's reliability despite the fact she lacks memory and admits she is assuming certain facts and re-creating what happened.  Defendant

Jacobson makes excuses for JANE ROE's contradictions and inability to recall, while discrediting DOE for that same inability to recall.

102.     Defendant Jacobson used the terms "augmented," "external influences" and "not implausible," (just to name a few,) to describe JANE ROE's version of events.   Defendant Jacobson did not need to use those terms to describe DOE's version of the events, yet he still found JANE ROE reliable and DOE unreliable.

103.     This is just one example of the extreme bias of Defendant Jacobson and the predetermined outcome of the investigation.   Other examples include, but are not limited to:

> a.  JANE ROE also filed a complaint in family court which contradicts any version of the events she provided to Defendant Jacobson.   Defendant Jacobson acknowledges this as an "exaggerated description of the events," but chalks this up to an "overzealous" Vera House representative[3] who assisted JANE ROE in filing the family court complaint and not to JANE ROE's credibility.

> b.  Defendant Jacobson writes that during his initial interview of JANE ROE, it was evident that her recounting of the night was augmented by information learned from speaking with other witnesses, primarily her friends and roommates, about that night.   These are the same friends who, throughout Defendant Jacobson's report, engage in wild speculation and conclusory statements such as "we knew something happened" without presenting any evidence.

---

[3] Vera House is a non-profit that assists and advocates for victims of sexual assault.

c.  JANE ROE stated several times that she believed she was drugged and Defendant Jacobson states that this is "not implausible" despite the fact the toxicology report from the SANE shows there are no traces of any unusual drugs.  Defendant Jacobson's statement that it is "not implausible" goes out of its way not to contradict or discredit JANE ROE, while entirely discrediting the science of toxicology.

d.  JANE ROE stated that she believed the SANE showed there were traces of semen in her vagina, while the SANE makes clear there was no sign of any sexual contact or bodily fluids; and the DNA report finds no outside strands of DNA. Defendant Jacobson ignores this discrepancy, and does not even not address JANE ROE's lie about it.

e.  JANE ROE provided photos of her anus taken on May 8, 2017 (two-and-a-half weeks after the alleged incident) which purport to show injuries.  Defendant Jacobson credits these photos and completely disregards the SANE nurse's evaluation in April—immediately following the night in question—which stated that the anus showed no tearing or bruising or anything abnormal. Despite the fact the SANE notes clearly indicate that an anal exam occurred and that an anal swab was taken of JANE ROE, Defendant Jacobson somehow credits JANE ROE's recollection that no anal exam was conducted at the SANE at all.

f.  Defendant Jacobson repeatedly refers to JANE ROE's underwear as "soaked" with blood in the vaginal area, despite any evidence that this is true. Neither JANE ROE nor any witnesses used the word "soaked" (until Defendant

Jacobson introduces that term).  The police reports never made any reference to JANE ROE's clothes being "soaked" with blood.  Defendant Jacobson himself never examined the evidence, though he easily could have.  JANE ROE's clothes were collected by the SANE nurse and turned over to the SPD. Defendant Jacobson made no attempt to view the clothes, speak with the nurse, detective, or ADA assigned to the case regarding the condition of the clothes. In fact, ADA Barry's letter states there is no obvious blood stain on JANE ROE's underwear (see *Exhibit A*), yet Defendant Jacobson characterizes said clothes as "soaked" in blood.

g.  Despite JANE ROE's initial lack of recollection, JANE ROE later became insistent that an object was used during the alleged sexual assault.  JANE ROE claimed both a detective from SPD and the SANE nurse told her it appeared an object had been used.  Defendant Jacobson acknowledges that an object being used is "somewhat unlikely and there is no evidence supporting the theory," yet he nonetheless attributes the declaration to "external conjecture and relying on what an authority figure told her."  Defendant Jacobson did not challenge this claim that an object was used or investigate it any further (such as asking Det. Bates or the SANE nurse whether they told this to JANE ROE). Had Defendant Jacobson bothered to ask either Det. Bates or the SANE nurse, he would have caught JANE ROE in another glaring lie.  Defendant Jacobson's attribution of these statements to external individuals rather than conceding a repeated pattern of unexplained inconsistencies clearly shows his bias in the investigation.

h. During his initial interview of DOE, Defendant Jacobson asked DOE "Why would this girl lie?" That is not an impartial question, nor does it represent an unbiased investigation that begins with having to disprove JANE ROE's allegation.

i. During the second interview of DOE, where DOE's attorney, Scott Brenneck, was present, Defendant Jacobson asked if DOE recalled putting his hand under JANE ROE's clothes and touching her vagina the next morning. DOE stated he did not recall, and Mr. Brenneck pointed out that JANE ROE changed her statement to the police and corrected her story by clarifying that DOE *tried* to put his hands down her pants, but was unsuccessful. After Defendant Jacobson reviewed the police report in question, he acknowledged the police report stated DOE was unsuccessful in trying to touch JANE ROE's vagina. However, Defendant Jacobson again displayed his bias when he said to DOE and his attorney, "well you know how detectives are, they're great, but they write down what they think they heard."

104. Aside from taking statements from witnesses referred by JANE ROE or DOE, Defendant Jacobson did not conduct any actual investigation. He failed to speak with anyone from the SPD or OCDA, failed to compare the statements provided by JANE ROE to the many prior statements she gave to the SPD and medical officials, and failed to obtain the full report of the SANE. Defendant Jacobson even failed to examine JANE ROE's allegedly "bloody" (but actually not bloody) clothes which were collected during the SANE and turned over to the SPD.

105. The self-fulfilling prophecy came to fruition, and this flawed and predetermined process led Defendant Jacobson to credit the accuser over the accused every step of the way.

Defendant Jacobson completely ignored JANE ROE's contradictory statements; he also failed to acquire evidence from the police, district attorney, or hospital.

106.    Further, Defendant Jacobson's investigation was not timely.  Despite the fact the complaint was filed on June 2, 2017, August 1, 2017 came and went and the investigation was not completed, nor was JOHN DOE notified that the investigation would be extended as required by Section 10.10 of the Student Handbook.

107.    On September 8, 2017, DOE belatedly received an email from Defendant Johnson-Willis (Defendant Syracuse's Chief Title IX Officer) informing him that the investigation and Conduct Board decision would not conclude within the 60-day timeline.  This was rather apparent to DOE at the time, as this notification was sent **98 days after JANE ROE filed her complaint and the investigation commenced**.  Defendant Johnson-Willis stated the timeline was being extended "due to the availability of witnesses and the number of witnesses."  However, in sworn testimony under oath, Defendant Jacobson stated the primary reasons for the delay was his work on other matters and his time out of the office during the summer.  This does not and should not qualify as "special circumstances."

108.    Defendant Jacobson finally issued his report on October 5, 2017—more than four months after the complaint was filed and investigation commenced.  However, the process within the 60-day timeline was still not complete as the Conduct Board hearing and decision was still to come.

109.    On October 16, 2017, Scott Brenneck, DOE's counsel at the time, sent Defendant Jacobson a letter in response to Defendant Jacobson's report, and requested that the letter be included in DOE's response. (Defendant Jacobson previously knew Mr. Brenneck would be drafting a letter in response to the report and never objected to Mr. Brenneck providing such letter.)

Defendant Jacobson had requested that Mr. Brenneck provide any DNA or toxicology reports because Defendant Jacobson never obtained such information prior to issuing the report.

110.    On October 17, 2017, Defendant Johnson-Willis responded and informed DOE that Defendant Syracuse does not accept any responses from attorneys. On October 18, 2017, Mr. Brenneck responded to Defendant Johnson-Willis and stated that Defendant Jacobson had never voiced any objection or concern regarding Mr. Brenneck submitting a response, and questioned that if Defendant Jacobson had agreed to accept certain documents from Mr. Brenneck, why not also accept his response? That same date, Defendant Johnson-Willis informed Mr. Brenneck and DOE that Mr. Brenneck's letter will not be incorporated into DOE's response[4], but the toxicology report and DNA results will be incorporated. But the DNA report was not available yet—which Defendant Johnson-Willis entirely failed to understand.

111.    On October 27, 2017, DOE filed a complaint with Defendant Syracuse regarding Defendant Jacobson's bias in conducting the investigation.  DOE's complaint was later dismissed.

## G.   The Hearing And Hearing Board's Determination

112.    Under Defendant Syracuse's Policies, once the investigator has completed the investigation, he provides the alleged Code of Student Conduct violations, the written investigation report, and the written responses of the complainant and respondent to a three-member University Conduct Board "comprised of trained faculty and staff members[]" ("Board"). (*Student Conduct System Procedures*, 10.7.)

113.    The Board, at its sole discretion, "may rely upon the investigator's report for its understanding of the relevant facts, or it may conduct additional witness interviews and/or gather

---

[4] DOE revised his response to include comments from Mr. Brenneck, but Defendant Johnson-Willis' unwillingness to accept the letter, yet accept certain evidence, from Mr. Brenneck illustrates the improper procedures followed by Defendant Syracuse in this matter.

other additional information." The Board may also interview the investigator. (*Student Conduct System Procedures*, 10.8.). The Board did not interview additional witnesses, nor did they interview the investigator.

114. The Student Conduct Procedure further provides that: "The complainant and respondent will be invited to speak to the University Conduct Board to present any additional information that they believe is relevant to the case." (*Student Conduct System Procedures*, 10.8.)

115. Per the University's Policies, at the hearing, the Board must apply a "preponderance of evidence" standard of proof, meaning it must find that it is "more likely than not" that the respondent violated the Code of Student Conduct. (*Student Conduct System Procedure*s, 5.3.).

116. On November 8, 2017, the University Conduct Board held a hearing before a three-member panel.

117. At the hearing, JANE ROE argued that DOE raped, sodomized and touched JANE ROE's genitals without consent. JANE ROE also stated she incurred physical injuries to her vagina and anus, as well as general pain and discomfort that lasted several days after the alleged incident.

118. DOE was permitted to have a "supporter" or "advisor" attend the hearing, and his lawyer, Mr. Brenneck was present. However, Mr. Brenneck was not permitted to speak during the course of the hearing proceeding. DOE, through Mr. Brenneck, was denied any opportunity to cross-examine JANE ROE regarding her allegations and confront her many inconsistencies, most notably her numerous prior statements that she did not recall what happened that night.

119. On November 15, 2017, DOE received the Board's decision in a letter issued by Defendant Peter—**166 days after ROE's formal complaint was filed**. Defendant Peter's letter advised DOE that he had been found "responsible" for the three code violations.

120. The University Conduct Board published findings of fact. They included that both JANE ROE and DOE could not remember walking to DOE's room, nor could they remember any events following entering DOE's room until waking up the next morning.

121. The University Conduct Board—with unabashed contradiction—also found that injuries to JANE ROE occurred as a result of unwanted sexual contact, despite the aforementioned finding that JANE ROE could not remember the events.

122. The University Conduct Board also stated that though the means by which the injuries occurred are unknown, it is more likely than not that the injuries were inflicted by DOE.

123. The Board found it more likely than not that the injuries were caused by DOE inserting an unknown object (finger, penis, or other unknown item) into JANE ROE's vagina.

124. Similar to Defendant Jacobson, the Board credited JANE ROE despite her inability to recall what occurred in DOE's room.

125. Most incredibly, the Board found that evidence from the SANE examination substantiates JANE ROE's assertion of sexual violation. Not only is there is no evidence from the SANE examination that leads one to conclude there was a sexual assault (as noted by ADA Barry), but Defendant Jacobson did not even obtain the SANE report and submit it to the Board for its review. The Board only had two pages of notes from Defendant Jacobson regarding the SANE because he failed to obtain the actual SANE report. Additionally, Defendant Jacobson was not called as a witness at the hearing either.

126. Furthermore, the Board's incredulous finding that evidence from the SANE examination—despite not even having the SANE report—substantiates JANE ROE's assertion of sexual violence directly contradicts the finding of the OCDA and ADA Barry, who stated that the

SANE examination did not prove that there was even any sexual conduct at all whatsoever, either consensual or non-consensual.

127.     The Board also held that JANE ROE's description of her experience, beginning when she woke up the next morning in DOE's room, was consistent with someone who has experienced trauma, despite the fact that no trauma expert testified at the hearing, there was no evidence to that effect, and, upon information and belief, no one on the Board is an expert in this area.

128.     The Board acknowledged receiving the letter from ADA Barry, but the Board discredited the letter due to differing standards of proof in a criminal case—despite ADA's Barry objective findings of the investigation that had nothing to do with standards of proof *(i.e.* there was no proof of sexual contact, consensual or non-consensual).

129.     The only explanation for such findings is bias in favor of the female accuser.

130.     Due to the everchanging version of events told by JANE ROE, the toxicology report, the DNA report, the lack of physical evidence, and ADA Barry's letter, an objective, unbiased fact-finder would have found it virtually impossible to credit JANE ROE over DOE.

131.     The Board's findings were based on speculation, not the preponderance of credible evidence.  As such, their findings violate Defendant Syracuse's Policies.

## H.  The University Board's Sanction to DOE

132.     As a result of the Board's biased decision on November 15, 2017, DOE was expelled from Defendant Syracuse on that same day.

133.     DOE timely submitted his appeal.

134.     On November 29, 2017, the University Appeals Board held a hearing.

135.    On December 5, 2017, Rebecca Reed Kantrowitz, Interim Senior Associate Vice President and Dean, informed DOE by letter that the University Appeals Board had denied his appeal and sustained the earlier decision of the University Conduct Board.

136.    The University Appeals Board upheld DOE's expulsion from Defendant Syracuse.

## I.   Gender Bias Against JOHN DOE

137.    Pursuant to the U.S. Department of Education Office for Civil Rights' Guidelines, Defendant Syracuse was required to conduct an impartial and unbiased investigation process.

138.    Upon information and belief, Defendants here have recognized the increased pressure, both internally and from the United States government, to aggressively discipline male students accused of sexual misconduct, under threat of rescission of federal funds.

139.    In fact, Defendant Syracuse's response to this pressure, and attempts to avoid rescission of federal funding, is evident from a review of its recent Annual Fire Safety & Security Reports (the "Clery Reports"). Defendant Syracuse's Clery Reports dating back to 2013 reveal that the number of forcible sex offenses/rapes reported on Defendant Syracuse's campus has steadily increased from three (3) cases in 2013; to nine (9) cases in 2014; to fourteen (14) cases in 2015; to fifteen (15) cases in 2016; and to nineteen (19) cases in 2017. Chancellor Defendant Syverud's 30-member Task Force on Sexual and Relationship Violence, established in 2015, was influential in expanding the options for reporting sexual assaults and resulted in a steady increase in the number of forcible sex offenses reported annually.

140.    Upon information and belief, Defendant Syracuse has repeatedly conducted gender-biased investigations, conducted unfair procedures, and imposed disproportionate sanctions against male students accused of misconduct due to its reliance on the "trauma-informed" approach and victim-centered approach to investigations.

### J. DOE's Damages As A Result of Defendant Syracuse's Actions

141.     Since being expelled from Defendant Syracuse in November 2017, DOE has suffered grave emotional distress and mental anguish.

142.     As a result of Defendants' actions, DOE has suffered, and continues to suffer, severe and significant emotional damages, including depression and social anxiety.

143.     DOE also suffered significant economic damages as a result of Defendant Syracuse's erroneous decision to expel him. Following DOE's expulsion from Defendant Syracuse University, DOE moved back to New Jersey and enrolled at New Jersey Institute of Technology (NJIT) where only 55 of his 115 undergraduate credits from Defendant Syracuse were accepted. Because of this, DOE received his bachelor's degree from NJIT in 2019, whereas he was on pace to graduate from Defendant Syracuse in 2018 with his undergraduate degree and 2019 with his MBA. This cost DOE an extra three regular semesters and two summer semesters of tuition for his bachelor's degree, and he lost all 15 credits towards his master's.

144.     Furthermore, as a result of Defendants' actions, JANE ROE has gone on to defame DOE on social media by repeatedly calling him a "rapist" while touting Defendant Syracuse's decision to expel DOE (despite the SPD and OCDA's statements completely exonerating him). These defamatory statements by JANE ROE have caused DOE to be fired from an internship and suffer other related damages. JANE ROE's defamatory actions are the subject of a separate lawsuit which is currently pending in a different federal district court[5].

145.     DOE has been irreparably harmed by Defendants' unlawful actions and seeks financial damages.

---

[5] The citation for this case is available upon the Court's request.

## AS FOR A FIRST CAUSE OF ACTION
## Violation of Title IX of the Education Amendments of 1972- 20 U.S.C. § 1681
## (All Defendants)

146.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth at length herein.

147.     Title IX of the Education Amendments of 1972 provides in pertinent part that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

148.     Title IX of the Education Amendments of 1972 applies to all public and private education institutions that receive federal funding, including Defendant Syracuse.

149.     Title IX bars the imposition of discipline against students where gender is a motivating factor in the decision to discipline.

150.     The decisions of the hearing process and appeal process for DOE were erroneous outcomes which were the direct result of a flawed and biased proceeding.  DOE was—and is— innocent and was wrongly found to have committed violations of Defendant Syracuse's policies, and gender bias infected the entire proceeding.  In a fair and unbiased process, whether someone is a "victim" is a conclusion to be reached at the end of a fair process, not an assumption made at the beginning because the accuser is a female and the accused is a male.  Defendant Syracuse unfairly has inverted the presumption of innocence and presumed DOE's guilt because he was a male accused of sexual assault rather than evaluating the case on its merits.

151.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student...complaints alleging any action

which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

152.    The "prompt and equitable" procedures that a school must implement include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint ....."

153.    Defendants failed to conduct an adequate, reliable, and impartial investigation of JANE ROE's complaint due to the reliance on the "trauma-informed" and victim-centered approach.

154.    Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon DOE. These circumstances include, without limitation:

a.    the investigator, Defendant Jacobson, accepted JANE ROE's allegations of sexual misconduct at face value, and he did so because, on information and belief, his prior career as an advocate for victims of sexual assault predisposed him to immediately believe the story of a female accuser;

b.    the investigator, Defendant Jacobson, assisted JANE ROE in developing her

story and accepted, without question, major changes in that story, including most particularly the fact that JANE ROE repeatedly stated that she did not recall the night in question and then changed her story to include fragments of memory about being sexually assaulted. Defendant Jacobson did so because, on information and belief, his prior career as an advocate for victims of sexual assault predisposed him to believe the accusations of a female victim over the denials of the accused male, and Defendant Syracuse's reliance on the "trauma-informed" and victim-centered approach;

c. Defendant Jacobson and Defendant Syracuse, through the University Conduct Board and Appeals Board, disregarded and explained away fatal inconsistencies in JANE ROE's statements to avoid finding her less credible;

d. Defendants demonstrated a presumption of guilt against DOE by finding him less credible merely because he could not recall details of the night in question, despite JANE ROE's similar statements that she too could not recall details of the night. The only possible explanation for these incongruous credibility assessments is gender bias.

e. Defendants' erroneous and unsupportable decision to find DOE responsible for sexual assault and expel him from Defendant Syracuse occurred at a time when Defendant Syracuse was being investigated by the Office for Civil Rights for its alleged failures to adequately address female students' complaints of sexual misconduct.

155. Further, upon information and belief, Defendant Syracuse was encouraged by federal officials following the "Dear Colleague Letter" to institute disciplinary procedures in

sexual misconduct cases that abrogate the civil rights of men and treat men differently than women. Defendant Syracuse did so.

156.     Upon information and belief, Defendant Syracuse was motivated in this instance to accept the female's accusation of sexual assault so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students. The investigators, hearing panel, and administration adopted a biased stance in favor of the accusing female and against the defending male in order to avoid the criticism that Defendant Syracuse turned a blind eye to such assaults by men.

157.     Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and decision to expel DOE. These circumstances include but are not limited to:

    a.  A general atmosphere at Defendant Syracuse where those who lodge a complaint of sexual assault are immediately treated as "survivors." This general atmosphere is a direct result of pressure on Defendant Syracuse from OCR, student groups, and public opinion;

    b.  The adjudication of the claims against DOE occurred at the time that Defendant Syracuse's officials were touting New York's "Enough is Enough" law as well as their own aggressive approach to issues of sexual assault on campus;

    c.  The failure of Defendant Syracuse to conduct a full and fair investigation;

    d.  The failure of Defendant Syracuse to afford accused students counsel, the opportunity to present evidence in their defense, or to effectively cross-examine their accusers under the auspices of "protecting" victims;

    e.  The Sexual Misconduct Policy denies male students the basic guarantees of

fundamental fairness in hearings. These rights include an impartial decision-maker, the assistance of counsel, the ability to confront adverse witnesses, the right to remain silent in the face of criminal accusations, and the presumption of innocence.

158. Defendant Syracuse assumed that JANE ROE, as an alleged female victim, was truthful and reliable, and went to great lengths to excuse her flagrant inconsistencies. As a result of this gender bias, Defendant Syracuse failed to adequately investigate and question JANE ROE's credibility. Defendant Syracuse's practices and procedures are biased in favor of unfairly protecting female accusers.

159. Upon information and belief, Defendant Syracuse has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

160. Upon information and belief, Defendant Syracuse's mishandling of JANE ROE's complaint was informed by internal institutional pressure as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds.

161. Based on the foregoing, DOE was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him—the male—responsible for sexual assault and to punish him severely for it.

162. As a direct and proximate result of Syracuse's violations of DOE's rights under Title IX, DOE has sustained severe and substantial damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

163.     As a result of the foregoing, JOHN DOE is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, pursuant to 42 U.S.C. § 1988.

## AS FOR A SECOND CAUSE OF ACTION
### BREACH OF CONTRACT
### (Defendant Syracuse University)

164.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth at length herein.

165.     Upon enrollment at Defendant Syracuse, and at all times relevant hereto, a contractual relationship existed between Defendant Syracuse and JOHN DOE through Defendant Syracuse's Policies and procedures governing the student disciplinary system, including but not limited to the Student Conduct System Handbook and Code of Conduct.

166.     Through the documents it publishes and provides to students, Defendant Syracuse makes express contractual commitments to students involved in a disciplinary process.

167.     Based on the foregoing, Defendant Syracuse created express and implied contracts with JOHN DOE.

168.     The Student Conduct System Handbook provides that "[t]he process of investigation and the Board's decision will be concluded within 60 days of the original complaint, pending special circumstances.  If circumstances arise that delays either the investigation or the Board's determination of an outcome, both parties will be sent written notification of the delay and its causes."

169.     Defendant Syracuse breached its agreements with JOHN DOE during the investigation and hearing process, including, without limitation:

    a.   Failing to conclude the investigation and Board's decision within 60 days;

     b.  No special circumstances existed delaying the investigation or the Board's determination; and

     c.  Failing to provide DOE with adequate and timely notification of any delay and its cause.

170.    On September 8, 2017, Defendant Syracuse first notified DOE that the investigation and Board's decision—which commenced following ROE's filing of a formal Complaint on June 2, 2017—would be delayed.  The notification stated "[o]ur timeline has been extended due to the availability of witnesses and number of witnesses." However, this notification was provided **98 days** after the Complaint was initially filed—not within the 60-day timeframe.  Defendant Syracuse was required, pursuant to the Student Conduct System Handbook, to notify DOE that the investigation and Board's decision was complete by August 1, 2017, **or** provide DOE with notice by August 1, 2017 that the investigation and Board's decision was being delayed and the cause(s) for such delay.  Neither was done here, in violation of the contractual promises of the Student Conduct System Handbook.

171.    In addition to the notification being untimely, the notification did not provide special circumstances that actually existed.  In fact, no special circumstances existed.  Defendant Jacobson has testified under oath that the primary reasons for the delay were that he was busy working on other matters and taking time off during the summer.

172.    Defendant Syracuse's investigation and Board's determination then took a total of **166 days** from Complaint to determination—106 days more than the timeframe provided for in the Student Conduct System Handbook.

173.    Had Defendant Syracuse University completed the investigation within the 60-day time frame, it would have concluded by August 1, 2017—during the summer before the fall 2017

semester commenced. However, due to Defendant's failure to timely complete the investigation, DOE re-enrolled at Defendant Syracuse University for the fall 2017 semester. DOE paid the necessary tuition and fees, including room and board costs. Had the investigation been completed within the required 60 days, DOE would not have had to forfeit the fall 2017 semester's tuition and other fees.

174. In addition, the delay caused DOE anxiety and caused him to suffer severe and significant emotional damages for which he has sought professional medical services.

175. Courts in this District have recognized that Defendant Syracuse's Student Conduct Handbook's 60-day provision is not a generalized "policy statement" or "unspecified procedure" and does constitute a specific contractual promise that can give rise to a cause of action. *See*, *e.g.*, *Doe v. Syracuse University, et al.*, No. 19-cv-190 (BKS/ATB), 2020 WL 871250, at *14 (N.D.N.Y. Feb. 21, 2020).

176. As a direct and foreseeable consequence of the foregoing breaches, JOHN DOE sustained damages and continues to sustain to damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

177. As a result of the foregoing, JOHN DOE is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff's prayer for judgment and relief are as follows:

(i)     on the first cause of action for violation of Title IX of the Education Amendments of 1972, 1) a declaratory judgment per 28 U.S.C. § 2201 that Defendant Syracuse

violated Title IX by erroneously finding JOHN DOE responsible for sexual misconduct in violation of Defendant Syracuse's Policy and unjustly severely sanctioning him by expelling him, 2) a monetary judgment awarding JOHN DOE damages in an amount to be determined at trial, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and 3) a permanent injunction as stated in subparagraph (iii) below;

(ii)    on the second cause of action for breach of contract, 1) a declaratory judgment per 28 U.S.C. § 2201 that Defendant Syracuse breached its contract with JOHN DOE, and 2) a monetary judgment awarding JOHN DOE damages in an amount to be determined at trial, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, past and future economic injuries, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements,

(iii)    a permanent injunction that: (i) the outcome and findings made against JOHN DOE by Defendant Syracuse be vacated; (ii) JOHN DOE's disciplinary record be expunged of all references to the disciplinary case; (iii) all records related to JOHN DOE's expulsion from Defendant Syracuse be removed from his educational file; (iv) any record of the complaints filed against JOHN DOE be permanently destroyed; (v) reinstituting JOHN DOE's status with Defendant Syracuse to the status which existed prior to June 2, 2017; and (vi) a finding that Defendant

Syracuse's Policies applicable at the time of JOHN DOE's case were unconstitutional as applied; and

(iv)    an award to JOHN DOE for such other and further relief as the Court deems just and proper.

Dated: New York, New York
June 12, 2020

Respectfully submitted,

ChaudhryLaw PLLC

By: /s/Seth J. Zuckerman
Seth J. Zuckerman Esq. (N.D.N.Y. Bar No. 700414)
Priya Chaudhry, Esq. (admitted *pro hac vice*)

45 West 29th Street, Suite 303
New York, NY 10001
Tel.: (212) 785-5558
Email: szuckerman@chaudhrylaw.com
Email: priya@chaudhrylaw.com
*Attorneys for Plaintiff JOHN DOE*